

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

AP-75,218

---

ANDRE LEE THOMAS, Appellant

v.

THE STATE OF TEXAS

---

DIRECT APPEAL FROM CASE 51858 OF
THE 15TH DISTRICT COURT OF
GRAYSON COUNTY

---

*WOMACK, J., delivered the opinion for a unanimous Court.*

The appellant was indicted for the capital murder of Leyha Marie Hughes.[1] He pleaded

not guilty by reason of insanity.[2] In March 2005, the jury found the appellant guilty. Based on the

jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071,

---

[1] *See* PENAL CODE § 19.03(a)(8).

[2] *See* PENAL CODE § 8.01.

sections 2(b) and 2(e), the trial judge sentenced the appellant to death.[3] In the appeal to this court,

required by statute,[4] the appellant raises ten points of error, which we find to have no merit. We

affirm.

## ADMISSION OF STATEMENTS

In points of error one and two, the appellant argues that the trial court erroneously denied

his motion to suppress videotaped and audiotaped statements he made to police on March 29 and

March 30, 2004, respectively. The appellant claims that these statements were taken in violation

of *Miranda v. Arizona*.[5] He contends that his mental illness rendered him incapable of knowingly

and intelligently waiving his *Miranda* rights because he did not understand the meaning, effect,

and consequences of his confessions and waiver.[6]

---

[3] *See* Act of June 16, 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2899-900 (amended 2005) (current version at CODE CRIM. PROC. art. 37.071, § 2(g)). Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

[4] *See* CODE CRIM. PROC. art. 37.071, § 2(h).

[5] 384 U.S. 436 (1966).

[6] The appellant also alleges violations of Articles 1.05, 38.21, 38.22, and 38.23 of the Code of Criminal Procedure; the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and Article I, Sections 9 and 10, of the Texas Constitution. However, the *Miranda* waiver issue was the crux of the appellant's argument at the suppression hearing. When defense counsel was specifically asked to clarify the grounds of the suppression motion, she stated on the record:

> Basically, Your Honor. It is the Defense's position that at the time he made the statement, that Andre Thomas made statements to law enforcement or jail personnel or psychologist or psychiatrist, before he was committed to Vernon, that he was incompetent to either waive his rights or knowingly and intelligently make those statements. And we are asking that those statements to be suppressed.

Likewise, the appellant's brief focuses on the *Miranda* waiver issue. His brief presents no separate argument nor does it cite authority to support the other allegations. Therefore, we consider only the *Miranda* issue here. *See Salazar v. State,* 38 S.W.3d 141, 147 (Tex. Cr. App. 2001); TEX. R. APP. P. 38.1(h).

An inquiry into the waiver of *Miranda* rights "'has two distinct dimensions.'"[7] First, the waiver must be "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'"[8] Second, the waiver must be made "'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'"[9] However, the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."[10] It is enough that a "suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."[11]

As regards the issue of voluntariness, the Fifth Amendment is interested only in official, governmental coercion which leads to a defendant's relinquishing his rights. It "is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"[12] The appellant does not contend that he was coerced into waiving his *Miranda* rights.[13] With these standards in mind, we turn to the question of whether he knowingly and intelligently waived his rights.

---

[7] *Colorado v. Spring,* 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

[8] *Ibid.*

[9] *Ibid.*

[10] *Id.*, at 574.

[11] *Ibid.*

[12] *Colorado v. Connelly*, 479 US 157, 170 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

[13] In fact, at the suppression hearing, the appellant's counsel said, "[W]e are not disputing that this was a voluntary waiver. In other words, we are not claiming there was any coercion or duress or threats made by anyone."

The evidence at the suppression hearing showed that Officer Chris Mullins of the Sherman Police Department was dispatched to a triple homicide on March 27, 2004. When he arrived at the victims' apartment at 7:22 a.m., he saw that the front door had been "kicked in." Inside the apartment, he found the bodies of the three victims: Laura Christine Boren, the appellant's estranged wife; Andre Lee Boren, the appellant's four-year-old son; and Leyha Marie Hughes, the appellant's one-year-old stepdaughter. All three victims had been stabbed and had large, gaping wounds to their chests.

At about 9:30 a.m., the appellant entered the lobby of the Sherman Police Department and told Police Dispatcher Cindy Carr that he had just murdered his wife and wanted to turn himself in. Officer Chuck Maudlin went to the lobby and frisked the appellant for weapons. Maudlin testified that the appellant, who appeared lethargic and calm, asked, "Will I be forgiven?" and said he had stabbed himself in the chest. Detective Brice Smith handcuffed the appellant and arrested him. The appellant was then transported to a hospital for treatment, where Smith later arrested him pursuant to an arrest warrant.

On March 29, at about 11:00 a.m., Officer Brad Blankenship went to see the appellant at the hospital. The appellant had undergone surgery and was to be released that day. During Blankenship's visit, Officer William Caver was on guard in the appellant's hospital room. Blankenship testified that he asked the appellant if he would be willing to talk to the police about the offense. The appellant replied, "Yes, if that means I get to tell my side of the story. Yes, I want to talk to you." Blankenship told the appellant that another officer would come to take his videotaped statement after lunch, and the appellant said that would be "fine." Blankenship further testified that, although he had not yet advised the appellant of his rights under *Miranda* and

Article 38.22, the appellant asked something to the effect of, "Shouldn't I have a lawyer?" Blankenship attempted to clarify whether the appellant wanted to give a statement, and the appellant said "he thought he needed to have a lawyer first." Blankenship advised the appellant that he would not be able to take his statement at that time because the appellant had said "the magic words" that he wanted an attorney. Blankenship then left the appellant's room.

Officer Caver testified that, after Blankenship left the room, the appellant asked where Blankenship was and said, "I thought he wanted to talk." Caver told the appellant that Blankenship had left because the appellant had "said the magic words." The appellant told Caver that he changed his mind, he wanted to talk to Blankenship, and he did not need a lawyer, whereupon Caver advised him that he could represent himself. Caver immediately left the room and found Blankenship. According to Blankenship's testimony, Caver informed him that the appellant wanted to make a statement immediately, had decided to act as his own attorney, and would waive his rights. Blankenship and Caver returned to the appellant's room. Blankenship told the appellant that he "did not want to take a statement from him under those conditions" and he "wanted to confer with the County Attorney's Office first."

The appellant was released from the hospital and was taken to the Sherman Police Department, where Detective Mike Ditto interviewed him on the afternoon of March 29. The interview was videotaped. The videotape was played during the suppression hearing. Ditto advised the appellant of his rights pursuant to Article 38.22, and the appellant waived his rights and agreed to talk. The appellant told Ditto about his earlier interaction with Blankenship. He acknowledged that he initially had told Blankenship he wanted a lawyer, but then had changed his mind and told another officer he did not want one. When Ditto asked if the other officer had

said anything, the appellant responded, "He started to say something, but I cut him off. . . . I figured that he was going to explain to me about my *Miranda* rights and I finished it for him."

The appellant told Ditto that he had killed his wife, son, and stepdaughter. He said that God had wanted him to do it, that the victims had been evil, that his wife had been a "jezebel," and that his son had been "the anti-Christ." Toward the end of the interview, the appellant said that he was tired and that he did not want to talk further. Ditto then gave the appellant his business card and told him to contact Ditto if he wanted to talk again later.

After his interview with Ditto, the appellant was taken to the Grayson County Jail, where he was magistrated by Judge Greg Middents and assessed by Nurse Natalie Sims. Middents testified that he read the appellant his warnings and rights twice, because the appellant had been in the hospital earlier that day and "was kind of groggy or maybe under some medication." Middents was satisfied that the appellant understood his rights and warnings. Middents also testified that the appellant requested that counsel be appointed and filled out an affidavit in support of his request. Sims testified that she met with the appellant to complete his medical history and mental-health-screening questionnaires. She testified that the appellant was "somewhat lethargic, sleeping intermittently in his chair" and that he told her he was given Darvocet right before his release from the hospital. However, Sims also said that the appellant appeared to understand her questions and answer them appropriately, and he seemed "oriented to time, place, and person."

Sims checked on the appellant after dinner on the evening of March 29. At that time, the appellant showed her Ditto's business card and said he wanted to talk to him. Sims told the appellant that, because it was late, she would have to get in touch with Ditto the next day. Sims

testified that she did not encourage the appellant to talk to the police and that no one from the police department had requested her to do so. She further testified that the appellant had not received any narcotic pain medication after leaving the hospital, and that the "doctor's orders" were only for wound treatment and non-narcotic pain medication, which she said generally meant Tylenol or Motrin.

On the morning of March 30, Sims contacted the Sherman Police Department to say that the appellant wanted to talk to Ditto. When Ditto and Texas Ranger "Tony" Bennie came to the Grayson County Jail, Sims told them she believed the appellant was "oriented to person, place, time, and location." She testified that the appellant was "lucid," "bright," and "alert" before the interview. At the appellant's request, the officers allowed Sims to be present while they questioned him. The officers audiotaped the interview and read the appellant his rights and warnings pursuant to Article 38.22. Sims testified that, in her opinion, the appellant appeared to understand his rights and to make an informed choice to talk to the police. During the hour-long interview, the appellant again related that he killed the victims because they were evil and God wanted him to do it. He also said that he cut open their chests and ripped their hearts out, and that he stabbed himself in the chest afterwards. Sims testified that the appellant exhibited some delusional behavior and said nonsensical things during the interview, "but he knew very much what was going on." She further testified that the appellant's mental condition deteriorated in the days following the Ditto interview. However, this did not change her opinion that, on March 30, the appellant fully understood his rights and made an informed choice to waive them. Later in the suppression hearing, two employees of the Grayson County Jail each testified that on April 2, a few days after making the statements to the police, the appellant pulled out one of his eyeballs

with his hands while alone in his holding cell at the jail. According to the testimony, the appellant yelled, "It's God's will," and said he had been reading his Bible, which indicated he might find favor with God by doing this.

At the suppression hearing, State's expert Peter Oropeza, a licensed psychologist who evaluated the appellant for the issues of sanity at the time of the offense and competency to stand trial, testified that the appellant had understood his rights and had voluntarily and intelligently waived them. Defense expert Jim Harrison, a clinical psychologist who evaluated the appellant's competency to stand trial, testified that the appellant had understood his rights and his choice to waive them. He was "not convinced," however, that the appellant "truly understood the full implication of what that meant in terms of his future."

The defense presented the testimony of social worker Sherrie St. Cyr and physician William Bowen, who each spoke to the appellant in the emergency room at Texoma Medical Center the day before the offense. They testified that they thought the appellant was psychotic and should have been admitted to a psychiatric facility. Cactus Robin McGirk, a psychologist at the Grayson County Jail, testified that he assessed the appellant after 5:00 p.m. on March 30, in order to advise the jail on his care and treatment while incarcerated. McGirk believed that the appellant had paranoid schizophrenia and that his "judgment process" was "considerably impaired" at that time. McGirk acknowledged that he never saw or heard the appellant's taped statements, and that there were "fluctuations in [appellant's] mental state." The trial court found that, because Bowen and McGirk had not seen or heard the appellant's taped statements, their testimony had "little relevance to the issue of [appellant's] ability to understand and waive his rights" and was not "credible in relation to that issue."

The evidence at the hearing also showed that, on several occasions before committing the instant offense, the appellant had been given his warnings by police officers and admonished of his rights by trial courts. He had understood those rights and, in several instances, had waived them. Testimony indicated that he was well versed in the criminal-justice system, both as a juvenile and as an adult, and that he had demonstrated his understanding of the system and his rights.

After the suppression hearing, the trial court made written findings of fact and the following conclusions of law regarding the admissibility of the appellant's statements:

1.

The defendant was in lawful custody at the time of his statements on March 29 and March 30, 2004.

2.

The issue before the court and the defense's contention in its Motion to Suppress is whether the defendant was competent to understand his rights and make a knowing waiver of those rights because of his mental state on March 29 and March 30, 2004.

The Court finds that the defendant understood his rights and was competent to knowingly and intelligently waive those rights.

3.

On March 29, 2004, the defendant indicated at the hospital he wanted to talk with an attorney before making a statement. Sgt. Brad Blankenship scrupulously honored this request by the defendant. However, before Blankenship left the hospital, the defendant initiated further contact with the police by telling Officer Caver that he wanted to talk and would act as his own attorney.

Once at the Sherman Police Department, the defendant was warned and advised of his rights pursuant to Article 38.22 of the Texas Code of Criminal Procedure, which he understood, and voluntarily, knowingly and intelligently waived his rights under the U.S. and Texas Constitutions and Article 38.22 of the Texas Code of Criminal Procedure on March 29, 2004, prior to giving his videotaped statement to Det. Mike Ditto, including his right to remain silent and his right to an attorney.

4.

On the evening of March 29, 2004, the defendant initiated further contact with law enforcement by advising nurse Natalie Sims that he desired to talk further with Mike Ditto.

On March 30, 2004, the defendant was warned and advised of his rights pursuant to Article 38.22 of the Texas Code of Criminal Procedure, which he understood, and knowingly, intelligently and voluntarily waived his rights under the U.S. and Texas Constitutions and Article 38.22 of the Texas Code of Criminal Procedure prior to talking with Mike Ditto and Texas Ranger Bennie, including his right to an attorney and his right to remain silent.

In determining whether the appellant knowingly and intelligently waived his *Miranda* rights, we afford almost total deference to a trial court's determination of historical facts and rulings on application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.[14] We review *de novo* a trial court's rulings on application-of-law-to-fact questions that do not turn on an evaluation of credibility and demeanor.[15] Where, as here, the trial court evaluates the credibility of witnesses and the weight of their testimony, "we will not disturb the trial court's findings if those findings are supported by the record."[16]

The record in this case supports the trial court's findings and conclusions. The trial court found that the credible testimony of the State's witnesses showed that the appellant understood his rights and that he knowingly and intelligently waived them. The appellant was no stranger to the criminal-justice system, and he had received and demonstrated an understanding of his rights and warnings on several prior occasions. The State and defense experts who evaluated the appellant's competency to stand trial both testified that the appellant understood his rights and

---

[14] *Ripkowski v. State*, 61 S.W.3d 378, 381 (Tex. Cr. App. 2001) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Cr. App. 1997)).

[15] *Id.*, at 381-82.

[16] *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Cr. App. 2000).

his choice to waive them. The trial court did not abuse its discretion in finding that the appellant's *Miranda* waiver was made knowingly and intelligently. Points of error one and two are overruled.

VOIR DIRE

In point of error three, the appellant contends that the trial court erroneously granted the State's challenge for cause to Venire Member Michael Ross.[17] The appellant complains that Ross was improperly excused from service based on his views regarding the death penalty.[18] The appellant disputes that Ross is challengeable under Article 35.16(b)[19] because he indicated that he could answer the special issues questions in such a way that a sentence of death would result, under the proper circumstances.

The appellant raises predominantly constitutional arguments but nevertheless asserts that Article 35.16(b) is controlling. The issue, however, is one of "constitutional dimension."[20] A prospective juror may be excluded for cause only if his views regarding the death penalty would "'prevent or substantially impair the performance of his duties as a juror in accordance with his

---

[17] The appellant's point of error states: The trial court erred in granting the State's challenge for cause, over appellant's objection, to prospective juror #43, Michael D. Ross, regarding his inability to ever vote for the death penalty.

[18] *See* CODE CRIM. PROC. art. 35.16(b); *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

[19] The applicable provisions of Article 35.16(b) state:
> A challenge for cause may be made by the State for any of the following reasons:
> 1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;
> . . . .
> 3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

[20] *Feldman v. State*, 71 S.W.3d 738, 749 (Tex. Cr. App. 2002).

instructions and his oath.'"[21] This means that venire members may not be excused for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."[22] As long as a venire member, despite his personal beliefs against the death penalty, can follow the law, abide by his oath, and answer the special issues according to the law and the evidence, he is not challengeable for cause.[23]

We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate a venire member's demeanor and responses.[24] In reviewing a trial court's decision, we ask whether the "totality of the voir dire testimony supports the court's finding that the prospective juror is unable to follow the law as instructed, and reverse only if a clear abuse of discretion is evident."[25] We accord particular deference to the trial court when a venire member's answers are vacillating, unclear, or contradictory.[26]

When the prosecutor initially asked Ross if he "could fairly sit in judgment in a death penalty case," Ross replied, "Well, the honest answer to that is I really don't know." Further questioning by the prosecutor revealed the following:

---

[21] *Wainwright v. Witt,* 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *Feldman*, 71 S.W.3d, at 749.

[22] *Witherspoon*, 391 U.S., at 522.

[23] *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Cr. App. 1998); *Riley v. State*, 889 S.W.2d 290, 298-99 (Tex. Cr. App. 1993) (op. on reh'g).

[24] *Colburn*, 966 S.W.2d, at 517.

[25] *Ibid.*; *accord Granados v. State*, 85 S.W.3d 217, 231 (Tex. Cr. App. 2002).

[26] *Feldman*, 71 S.W.3d, at 749; *King v. State*, 29 S.W.3d 556, 568 (Tex. Cr. App. 2000); *Colburn*, 966 S.W.2d, at 517.

Q. So, I'm going to have to push you. If you're selected on this jury, could you in good conscience, fairly consider and sit in a death penalty case and not be affected by those feelings?

A. I don't think I could. I really don't.

Q. And I appreciate that. This is the time for us to know about it, right now. So, I want to clarify some things–there are some legal things I have got to go through on this. What I'm hearing you say is that, were you called upon to sit as a juror, number one, you would have great difficulties in sitting in a death penalty case, am I right?

A. Yeah, probably.

Q. And if you were called on to answer the questions–and these are the two questions–and we are not going to go through them in detail, but generally your answers to these questions determine whether or not the Judge has to give a death penalty. Okay?

A. Uh-huh.

Q. What I'm hearing you say is, because of your inner feelings about the death penalty and sitting in judgment and putting somebody to death, that there really is no circumstance where you could answer those questions such that they would result in a person being put to death; is that right?

A. Yeah, I think that would probably be right.

Q. And did you say yes?

A. Yes.

The prosecutor then asked Ross to clarify one of his answers on the jury questionnaire, where Ross circled, "I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case." Ross responded, "[I]n some cases, I'm sure that that is an appropriate thing, you know, but I'm not–I couldn't say I could be the one up there doing it." When asked to confirm that he could never participate in giving the death penalty, Ross said, "Could not. It would bother me if I ever had to." This exchange followed:

Q. So, what I want to confirm is that your difficulty with the death penalty would prevent you from taking that oath and a true verdict render when a death penalty is available. Is that true?

A. Yeah, I guess it would be. Because if you took the oath, you would be lying.

Q. I don't want a guess. I want–I need you to say, yes, I could not take that oath in a death penalty case. I could not take the oath that I will a true verdict render based on the law and the evidence in a death penalty case. Is that true?

A. It is true.

The trial judge then questioned Ross about whether he could answer the special issues questions so that death resulted, if supported by the evidence. Ross continued to express uncertainty about his ability to do that, but then he said:

You know, I mean, I would have to do the right thing. I can–you know, like on the evidence part, I mean, I could do that if that is what I was asked to do because that is just the way we believe. If you are supposed to do something, you know, you do what you are supposed to do. I could probably answer it yes or no on the evidence fact, you know. But it would go back to the thing that, I don't know, just with the deal, I wouldn't really want to be in that position.

The trial court ultimately asked, "[C]an you assure me you will totally set aside your feelings on the death penalty and base your verdict on the evidence, and do you think your feelings about the death penalty are going to color what you are going to do so you may not answer these according to the evidence?" Ross replied, "I think if it was another case I probably, you know, could. This particular one, probably not. I couldn't."

Defense counsel then questioned Ross. When asked if he could answer the special issues based upon the law and the evidence, Ross replied, "I would still be stuck with that death thing. I don't know." The trial judge again stepped in to clarify whether Ross could answer the special issues in such a way that the death penalty resulted if he thought that the law and the evidence

supported it. Ross answered, "If it was–if I had took the oath and all, I think I could, you know, by the oath, just on my word because that is what I'm supposed to do."

Upon further questioning by the prosecutor, Ross agreed that he could not answer the special issues in such a way that would result in death, and that he could not return a verdict that resulted in a death penalty under any circumstances.

Defense counsel then posed a hypothetical with a defendant who bombed a daycare, killed numerous children under the age of six, and "testified that he was antigovernment, he hated everybody, and that given the opportunity, he would kill again." Ross said, "I could probably come up with, you know, a death sentence on that one." However, in his final exchange with defense counsel, Ross stated as follows:

> Q. And what I'm saying is that since as you sit there, you don't know the facts and circumstances of this case or any other case. Could you listen to the evidence and answer these special issues and render a true verdict based upon the law and the evidence, even if the result would be death?
>
> * * *
>
> A. If it is on the death, I couldn't honestly say that I could. You know, the death penalty is, like I said, basically a problem.
>
> * * *
>
> A. Yeah, I think the death penalty would always have an influence on what my decision was, and I think it would be unfair to say I could do it, honestly, knowing that there's the death penalty.
>
> Q. So, you are saying, no, you could not?
>
> A. Yeah, I'm saying–or no, I'm saying, no, I can't.

Viewing the voir dire testimony as a whole, we find the trial court did not abuse its discretion in granting the State's challenge for cause. Ross vacillated in his statements about his

ability to follow the law and obey the instructions, then ultimately testified that he could not set aside his beliefs and answer the special issues in such a way as to impose the death penalty. We thus defer to the trial court's discretion in determining that Ross's beliefs regarding the death penalty would have prevented or substantially impaired the performance of his duties as a juror in accordance with his instructions and his oath. Point of error three is overruled.

PHOTOGRAPHS AND AUTOPSY REPORTS

In points of error four and five, the appellant claims that the trial court erroneously admitted evidence pertaining to Laura Boren Thomas and Andre Lee Boren, in violation of Rules 401, 402, and 403 of the Texas Rules of Evidence.[27] He specifically complains about crime-scene photographs (State's Exhibits 12 - 15 and 19 - 21), autopsy photographs (State's Exhibits 54 - 60), and autopsy reports (State's Exhibits 51 - 52). He argues that this evidence was irrelevant to the case involving the death of Leyha Marie Hughes, the only victim alleged in the indictment.[28] He also contends that the probative value of the evidence was substantially outweighed by its prejudicial effect and that the only purpose for the photos and reports was to "inflame and prejudice the jury" against the appellant so jurors would vote for death rather than life imprisonment.

---

[27] The appellant's points of error state:

Point of Error IV: The trial court erred in denying appellant's motion in limine and trial objection regarding photographs of alleged murder victims other than Leyha Hughes.

Point of Error V: The trial court erred in denying appellant's motion and trial objection to prohibit introduction of autopsy information regarding alleged murder victims other than Leyha Hughes.

[28] The indictment alleged that the appellant intentionally or knowingly caused the death of Leyha Marie Hughes, an individual younger than six years of age.

*Relevance of Photographs and Autopsy Reports–Rules 401 and 402*

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is generally admissible.[29]

The appellant's sanity was the main contested issue at trial. He did not dispute that he killed the victim, but he argued that, as a result of severe mental disease or defect, he did not know his conduct was wrong.[30] The photographs and autopsy reports were relevant to the jury's understanding of the appellant's mental state at the time of the offense. Because Laura and Andre were killed during the same criminal episode as Leyha, the information regarding their deaths goes to the issue of the appellant's sanity at the time of Leyha's death. Additionally, the appellant's statements to police were further evidence of his mental state at the time of the crime, and the photographs and autopsy reports pertaining to Laura and Andre corroborated those statements. Thus, they were relevant to the issue of the appellant's sanity.

*Rule 403*

The appellant next argues that even if the photographs and autopsy reports were relevant, they were unfairly prejudicial and therefore inadmissible under Rule 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

---

[29] Rule of Evidence 402 states: "All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible."

[30] *See* PENAL CODE § 8.01.

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."[31] The admissibility of evidence under Rule 403 is within the sound discretion of the trial judge.[32] We will reverse the trial judge's decision only for an abuse of discretion, that is, only if the decision falls outside the zone of reasonable disagreement.[33]

A Rule 403 analysis may include, but is not limited to, consideration of the following factors: (1) the probative value of the evidence, (2) the potential of the evidence to impress the jury in some irrational, yet indelible, way, (3) the time the proponent needs to develop the evidence, and (4) the proponent's need for the evidence.[34]

### Crime-Scene Photographs and Rule 403

With regard to the admissibility of photographs in particular, a court may consider many additional factors in determining whether they are unfairly prejudicial. These include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are color or black and white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case.[35] "It

---

[31] *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Cr. App. 2002).

[32] *Prible v. State*, 175 S.W.3d 724, 734 (Tex. Cr. App. 2005); *Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Cr. App. 1998); *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Cr. App. 1995).

[33] *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Cr. App. 2001); *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Cr. App. 1996).

[34] *Rodriguez v. State*, 203 S.W.3d 837, 843 (Tex. Cr. App. 2006); *Prible*, 175 S.W.3d, at 733; *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Cr. App. 2004); *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Cr. App. 1990).

[35] *Prible*, 175 S.W.3d, at 734; *Hayes*, 85 S.W.3d, at 815; *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Cr. App. 1997); *Long v. State*, 823 S.W.2d 259, 272 (Tex. Cr. App. 1991).

is also relevant for the trial court to consider whether the body as photographed has been altered since the crime in some way (*e.g.*, by autopsy) that might enhance its gruesomeness to the defendant's detriment."[36] "If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects."[37]

State's Exhibits 12 through 15 and 19 through 21 were all photographs taken at the crime scene. The exhibits appear in the record as 8" by 10" black-and-white copies of the original color photographs.[38] State's Exhibit 12 is a photograph of the living room area in which Laura's naked body is visible from the neck down. State's Exhibit 13 is a photograph depicting Laura's entire body lying face-up on the living room floor. State's Exhibit 14 shows Laura from the waist up and offers a closer view of her chest injury. State's Exhibit 15 depicts the hallway, and Laura's head and upper chest are visible at the bottom of the photograph. State's Exhibit 19 depicts Andre lying face-up in bed, and State's Exhibit 20 gives a closer view of his chest injury by showing him from the chest up. A bloody organ lying slightly above his head is visible in both photographs, and State's Exhibit 21 is a picture of the organ itself.

These photographs were admitted during the testimony of Ranger Bennie as he described for the jury what he found when he arrived at the crime scene to investigate. The photographs corroborated his testimony and assisted the jury in visualizing the crime scene. And because they

---

[36] *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Cr. App. 1992).

[37] *Erazo*, 144 S.W.3d, at 491-92. In *Erazo*, we noted that this court had often said that generally, a photograph is admissible if testimony regarding matters depicted in the photograph is also admissible. But in clarifying our previous case law regarding the admission of photographic evidence, we deemed this to be too broad a guide to be helpful to trial courts.

[38] Defense counsel stated for the record that the photographs introduced at trial were "in color."

depict the unaltered results of the appellant's actions during the murders, the photographs are highly probative and powerful evidence of the contested issue of the appellant's sanity at the time of the offense. The photographs also corroborated some of the appellant's statements to the police, which were key evidence of his mental state at the time of the crime.

Furthermore, there was little danger that the photographs would have influenced the jury in an irrational way. Although the photographs are gruesome, they portray nothing more than the gruesomeness of the injuries caused by the appellant himself.[39] The shocking and gruesome nature of the photographs undoubtedly prompted the appellant to complain about "unfair prejudice" and "inflaming the emotions of the jurors."[40] But those very qualities also give the photographs their probative force in assisting the jury to decide whether the appellant was insane when he committed the offense. The strong probative value of the crime-scene photographs, therefore, was not substantially outweighed by the danger of unfair prejudice.

Although the appellant's argument centered on unfair prejudice, in summing up the discussion in his brief, he referred to the photographs as "cumulative," as well as "prejudicial." Although he did not elaborate as to his meaning, the appellant indicated in a Rule 403 objection to all the crime-scene photographs at trial that they were cumulative of the videotape made of the crime scene. This court has said that a still photograph and a videotape are not cumulative of each other.[41] A photograph allows the jury to examine a scene in detail, while a videotape

---

[39] *See Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Cr. App. 2007); *Narvaiz*, 840 S.W.2d, at 429-30.

[40] *See Sonnier*, 913 S.W.2d, at 519.

[41] *Ripkowski*, 61 S.W.3d 378, 392 (Tex. Cr. App. 2001); *Matamoros v. State*, 901 S.W.2d 470, 476 (Tex. Cr. App. 1995).

provides a more panoramic depiction of the evidence.[42] The photographs were highly probative of the issue of the appellant's sanity, and their probative value was not substantially outweighed by their tendency to prolong the trial to the defendant's detriment.[43]

## Autopsy Photographs and Rule 403

"[A]utopsy photographs are admissible unless they depict mutilation of the victim caused by the autopsy itself."[44] A change of minor significance caused by the autopsy will not preclude admission of a photograph if its disturbing nature is primarily due to injuries caused by the appellant.[45]

State's Exhibits 54 through 60 are autopsy photographs taken after the bodies were cleaned. Laura's chest injury is visible in State's Exhibit 54, which is taken from the waist up. State's Exhibit 55 shows Laura from the waist down. State's Exhibit 56 depicts cuts on Laura's forearm. State's Exhibit 57 contains four smaller photographs, with two showing cuts on Laura's forearm, and two showing her chest wound, both open and closed. State's Exhibit 58 is a close-up view of Laura's open chest wound. In State's Exhibit 59, Andre is lying face-up and his chest wound is visible. State's Exhibit 60 offers a close-up view of Andre's chest wound.

The autopsy photographs were introduced during the testimony of medical examiner Dr. Sheila Spotswood. She used the photographs to describe to the jury Laura's and Andre's injuries and how the appellant had likely caused them, as well as to communicate to the jury her

---

[42] *Matamoros*, 901 S.W.2d, at 476.

[43] *See Ladd v. State*, 3 S.W.3d 547, 569 (Tex. Cr. App. 1999).

[44] *Santellan*, 939 S.W.2d, at 172.

[45] *Santellan*, 939 S.W.2d, at 173; *Salazar*, 38 S.W.3d, at 151.

conclusions regarding the causes of death. Spotswood testified that Andre's injuries were very similar to Leyha's. She also told the jury that three medical examiners worked together on the three autopsies, which were performed side-by-side and simultaneously.

As with the crime-scene photographs, the autopsy photographs of Laura and Andre were probative of the appellant's sanity at the time of Leyha's death. They helped the jury understand the injuries Laura and Andre sustained and the appellant's probable actions while inflicting them. Moreover, the prejudicial effect on the jury, if any, was likely minimal. The only change to the bodies that can be attributed to the autopsies is that the bodies have been cleaned. These changes are of minor significance; any potential prejudice is due to injuries the appellant caused. In fact, as a result of the autopsies, these photographs are less gruesome than those taken at the crime-scene. Their probative value was not substantially outweighed by the danger of unfair prejudice.

**Autopsy Reports and Rule 403**

State's Exhibits 51 and 52 are the autopsy reports for Laura and Andre, respectively. The reports were introduced during Spotswood's testimony, and they describe the findings of the autopsies in greater detail than the medical examiner's testimony. Although the appellant objected to the admission of the reports, he did not object to Spotswood's testimony regarding the results of Laura's and Andre's autopsies. The reports, like the photographs, were probative of a contested matter, that is, the appellant's sanity. Their ability to irrationally influence the jury's decision was minimal, and they contained little that could be considered inflammatory. The probative value of the autopsy reports was not substantially outweighed by the danger of unfair prejudice.

*Conclusion*

The trial court did not abuse its discretion in admitting the evidence regarding Laura Boren Thomas and Andre Lee Boren. The evidence was relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice. Points of error four and five are overruled.

STATE'S EXPERT WITNESS

In point of error six, the appellant complains that the trial court erred in overruling his objection to the State's presenting, during its case in chief, the testimony of Dr. Victor Scarano on the issue of the appellant's sanity at the time of the offense. He argues that the State should not have been permitted to offer any evidence on the issue of insanity until after the defense had presented its own evidence on that issue. The State counters that the issue was raised through the cross-examination of its witnesses during its case in chief, and that nothing barred the State from presenting rebuttal evidence once the issue had been raised. At trial, both the appellant and the State raised similar arguments. After the trial court overruled the appellant's objection, Dr. Scarano testified that, in his opinion, the appellant did not meet the legal definition of insanity.

This court has said that a defendant's theory of defense may be placed in issue, so as to permit admission of rebuttal evidence, during the State's case in chief.[46] In *Powell*, the defensive theory had been presented during the appellant's cross-examination of the State's complaining witness.[47] Although the instant case, unlike *Powell*, involves an affirmative defense,[48] we see no

---

[46] *Powell v. State,* 63 S.W.3d 435, 439-40 (Tex. Cr. App. 2001).

[47] *Id.*, at 436-37, 439.

[48] *See* PENAL CODE § 2.04.

reason for this distinction to bar the insanity defense from being raised during the State's case in chief under the proper circumstances. The critical distinction is the burden on the defense to prove insanity by a preponderance of evidence, and the burden in no way changes were this rule to be applied here.

The question in the instant case is whether the defense placed the appellant's sanity in issue during the State's case in chief, so as to permit Dr. Scarano's testimony. From the outset of the trial, the appellant's intention to use the insanity defense was clear. He pleaded not guilty by reason of insanity. During his opening statement, defense counsel said, "This case is about [the appellant's] journey into the world of madness and about his insanity at the time that these wicked crimes were committed." Defense counsel plainly focused cross-examination of almost every one of the State's witnesses on the appellant's mental state. For instance, defense counsel asked one police officer about the appellant's statements that his actions were the will of God. Defense counsel asked one of the appellant's friends about her prior statements that "if he were in his right mind he never would have done that," and "he couldn't have known what he was doing," as well as her discussion with the prosecutor about the "definition of crazy" and "whether or not [the appellant] was crazy or knew the difference between right and wrong." Defense counsel also asked Leyha's father, who had been living with the three victims at the time of the murders and who knew the appellant, whether he recalled "repeatedly telling [police] that Andre Thomas was crazy, unstable, everyone knew him and his entire family was crazy."

The appellant clearly raised his defensive theory of insanity before the State called Scarano to testify. The trial court did not abuse its discretion in admitting Scarano's testimony during the State's case in chief. Point of error six is overruled.

COMPETENCY DETERMINATION

In point of error seven, the appellant complains that the trial court erred by proceeding to trial without first making a judicial determination that he had regained competency after earlier having been found incompetent to stand trial.[49] He submits, therefore, that his conviction and sentence should be reversed and a new trial held, before which his competency should be determined.

In April 2004, defense counsel and the prosecutor both filed motions requesting that the appellant be examined to determine his competency to stand trial. The trial court ordered two psychologists to examine and evaluate the appellant for competency, both of whom subsequently filed reports determining the appellant to be incompetent to stand trial. On June 16, 2004, the trial court, having considered the psychological reports, found the appellant to be incompetent to stand trial and ordered him to be committed to the Texas Department of Mental Health and Mental Retardation–Vernon Campus for restoration to competency. In late July 2004, the appellant was returned to Grayson County. A report that the appellant was competent was filed by Dr. Joseph Black, Chief Psychiatrist for the Competency Program at the Vernon Campus, with copies for both parties. At trial in February 2005, after the State rested, defense counsel moved for a directed verdict because the trial court had proceeded to trial without determining that the appellant's competency had been restored.[50] The trial court overruled the appellant's motion for a

---

[49] The appellant's point of error claims: The trial court erred in overruling appellant's motion for directed verdict in that the State never established beyond a reasonable doubt that appellant was competent to stand trial after he had been previously adjudicated incompetent.

[50] Defense counsel initially argued that the State failed to prove beyond a reasonable doubt that the appellant was competent to stand trial. Upon further questioning by the trial court, defense counsel clarified that he was not arguing that the appellant was incompetent. Instead, he complained that "there was a previous adjudication of incompetency."

directed verdict, and found, pursuant to Article 46B.084 and after having taken judicial notice of Dr. Black's report, that the appellant was competent to stand trial.

When a trial court determines that a defendant is incompetent to stand trial, it may commit the defendant to a mental-health facility "for further examination and treatment toward the specific objective of attaining competency to stand trial."[51] When "the head of the facility" is of the opinion that the defendant has attained competency, he or she files a report with the court, with copies provided to both parties, and the defendant is returned to the committing court.[52] Article 46B.084 provides for proceedings upon the return of the defendant to the trial court:

> (a) On the return of a defendant to the committing court, the court shall make a determination with regard to the defendant's competency to stand trial. The court may make the determination based solely on the report filed under Article 46B.080(b), unless any party objects in writing or in open court to the findings of the report not later than the 15th day after the date on which the report is served on the parties.
> (b) If a party objects under Subsection (a), the issue shall be set for a hearing. The hearing is before the court, except that on motion by the defendant, the defense counsel, the prosecuting attorney, or the court, the hearing shall be held before a jury.
>
> * * *
>
> (d) If the defendant is found competent to stand trial, criminal proceedings against the defendant may be resumed.[53]

In *Schaffer v. State*, the trial court had failed to make a judicial determination of competency to stand trial after an earlier finding of incompetency.[54] This court abated the appeal

---

[51] CODE CRIM. PROC. art. 46B.073(b); *accord*, CODE CRIM. PROC. art. 46B.071.

[52] *See* Act of May 14, 2003, 78th Leg., R.S., ch. 35, § 1, 2003 Tex. Gen. Laws 57, 63 (amended 2007) (current version at CODE CRIM. PROC. art. 46B.079(b)); *id.*, at 63 (amended 2005, 2007) (current version at CODE CRIM. PROC. art. 46B.079(c)); *id.*, at 63 (amended 2005, 2007) (current version at CODE CRIM. PROC. art. 46B.081).

[53] *Id.*, at 64 (amended 2005, 2007) (current version at CODE CRIM. PROC. art. 46B.084).

[54] 583 S.W.2d 627, 631 (Tex. Cr. App. 1979) (op. on reh'g).

to allow the trial court to make a retrospective determination of competency.[55] In the instant case, the record reflects that neither the appellant nor the State had objected, either in writing or in open court, to the findings of Dr. Black's report. The trial court, therefore, was authorized under Article 46B.084(a) to make a determination on competency based solely on the report. Furthermore, as the absence of a finding of competency in *Schaffer* did not in any way render that trial invalid, neither here did a finding of competency made during the trial, albeit after the trial had already begun, render the proceedings invalid. The better practice is for the trial court to make the determination prior to trial.[56] However, because a judicial determination of competency has been made, we decline to abate this appeal.

The appellant further contends that because he had previously been adjudicated incompetent to stand trial, the State had the burden to establish, beyond a reasonable doubt, that the appellant had regained competency. He cites our decision in *Manning v. State* for support.[57] *Manning*, however, is distinguishable because, there, a pretrial competency hearing was held before a jury, and the issue was whether the jury instructions were correct in requiring the State to prove competency by a preponderance of the evidence.[58] In the instant case, no pretrial hearing was held. And defense counsel specifically told the trial court he was not claiming the appellant was not competent to stand trial. Without an objection or a claim of incompetency, the trial court was authorized to make the determination of competency as directed by Art 46B.084(a).[59]

---

[55] *Ibid.*

[56] *See* CODE CRIM. PROC. art 46B.084(d), *supra* note 53.

[57] 730 S.W.2d 744 (Tex. Cr. App. 1987).

[58] *Id.*, at 745-46.

[59] *See* CODE CRIM. PROC. art. 46B.084(a), (b), *supra* note 53.

Point of error seven is overruled.

## REASONABLE DOUBT INSTRUCTION

In point of error eight, the appellant complains that the trial court erroneously refused his request for a *Geesa* instruction defining the term "reasonable doubt."[60] He submits that this violated his equal-protection and due-process rights under the Texas and United States constitutions, and he urges this court to require that jury instructions contain a definition of the term in death-penalty cases.

At trial, the appellant requested that the jury be instructed as follows:

Reasonable doubt is a doubt based upon reason and common sense after a careful and impartial consideration of all of the evidence in the case–proof beyond a reasonable doubt. Therefore, it is proof in such a convincing character you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

In *Paulson v. State*, we overruled the portion of *Geesa* that required a trial court to instruct the jury on the definition of "beyond a reasonable doubt."[61] We quoted the Supreme Court's holding in *Victor v. Nebraska* that "'the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.'"[62] And we stated that "the better practice is to give no definition of reasonable doubt at all to the jury."[63] We decline the appellant's invitation to reconsider our decision in *Paulson*. Point of error eight is overruled.

---

[60] *See Geesa v. State,* 820 S.W.2d 154 (Tex. Cr. App. 1991).

[61] 28 S.W.3d 570, 573 (Tex. Cr. App. 2000).

[62] *Id.*, at 573 (quoting *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)).

[63] *Id.*, at 573.

INEFFECTIVE ASSISTANCE OF COUNSEL

In point of error nine, the appellant alleges that he was denied his right to the effective assistance of counsel to which he was entitled under the Sixth Amendment; Article I, Section 10 of the Texas Constitution; and Texas Code of Criminal Procedure Articles 1.05 and 1.051. He alleges five instances of ineffective assistance.

Claims of ineffective assistance of counsel are analyzed using the standard articulated by the United States Supreme Court in *Strickland v. Washington* to determine "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[64] In *Hernandez v. State*, this court adopted the *Strickland* standard for ineffective-assistance cases, stating that neither Texas' constitution nor its statutory provisions established a more protective standard than that set forth in *Strickland*.[65]

To prevail on these claims, the appellant must show, first, that counsel's performance was deficient.[66] That is, he must prove, by a preponderance of the evidence, that "counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms."[67] Second, the appellant must prove that this deficient performance prejudiced his defense.[68] This requires showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[64] 466 U.S. 668, 686 (1984).

[65] 726 S.W.2d 53, 56-57 (Tex. Cr. App. 1986).

[66] *Strickland*, 466 U.S., at 687; *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Cr. App. 2002).

[67] *Strickland*, 466 U.S., at 688; *accord Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Cr. App. 2002).

[68] *Strickland*, 466 U.S., at 687; *Mitchell*, 68 S.W.3d, at 642.

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[69]

Appellate review of counsel's performance is highly deferential.[70] The appellant must overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance" and "'might be considered sound trial strategy.'"[71] In order to overcome this presumption, the appellant must identify specific acts or omissions of counsel.[72] "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness."[73]

We have noted in the past that a reviewing court will rarely be able to fairly assess a claim of ineffective assistance when raised on direct appeal.[74] This is so because, typically, the record on direct appeal fails to reflect the rationale or motivation behind trial counsel's actions or inactions.[75] Under these circumstances, therefore, the appellant ordinarily will be unable to meet the first prong of the *Strickland* test, "as the reasonableness of counsel's choices and motivations during trial can be proven deficient only through facts that do not normally appear in the

---

[69] *Strickland*, 466 U.S., at 694; *accord Mallett v. State*, 65 S.W.3d 59, 62-63 (Tex. Cr. App. 2001).

[70] *Strickland*, 466 U.S., at 689; *Mata v. State*, 226 S.W.3d 425, 428 (Tex. Cr. App. 2007).

[71] *Strickland*, 466 U.S., at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

[72] *Id.*, at 690.

[73] *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Cr. App. 1999).

[74] *E.g.*, *Mata*, 226 S.W.3d, at 430; *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Cr. App. 2007); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Cr. App. 2005); *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Cr. App. 2003); *Bone*, 77 S.W.3d, at 833; *Mitchell*, 68 S.W.3d, at 642; *Thompson*, 9 S.W.3d, at 813-14.

[75] *Mata*, 226 S.W.3d, at 430 ("the record on direct appeal is usually undeveloped and inadequately reflective of the reasons for defense counsel's actions at trial."); *Bone*, 77 S.W.3d, at 833 ("[u]nder normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional."); *Thompson*, 9 S.W.3d, at 813-14 ("[i]n the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel.").

appellate record."[76] These claims are more effectively raised through an application for a writ of habeas corpus, where counsel may be afforded an opportunity to explain the reasons for his or her actions or omissions.[77]

*Failure to Seek Hearings and Rulings on Pretrial Motions*

The appellant claims that counsel filed numerous pretrial motions, but failed to have them heard or ruled upon by the trial court, "as evidenced by the unsigned orders." As a result, he argues, "nothing was preserved for appellate review."

With few exceptions, almost all of the motions the appellant cites were filed under the cause number for a companion capital-murder case pending against him, relating to the deaths of Laura Boren Thomas and Andre Lee Boren. Copies of these motions, with the accompanying unsigned orders, were filed for the record in the instant case. In July, 2006, an agreement was reached and an order signed in the companion case permitting all pretrial motions and associated hearings and rulings in that cause to apply to the instant case on appeal. The appellant is mistaken as to the disposition of at least two of the motions he cites. The first, "Motion for Defendant to be Restrained by Least Restrictive Means," was filed under both cases. The motion was taken up by the trial court immediately prior to voir dire and discussed on the record. Defense counsel clarified that he was not requesting that the appellant be restrained, but only that if he were to be restrained, as the trial court had intended, the restraint be the least restrictive possible. After hearing from both defense counsel and the prosecutor, the trial judge decided not to restrain the appellant.

---

[76] *Mata*, 226 S.W.3d, at 430.

[77] *Roberts*, 220 S.W.3d, at 533; *Rylander*, 101 S.W.3d, at 110.

The second motion, "Motion to Require State to Reveal Agreement or Admonition," is a copy of a motion from the companion case, filed for the record in the instant case.[78] The subject of this motion was also discussed on the record. Prior to the jury being sworn in, the following exchange occurred:

> [DEFENSE COUNSEL]: We had also filed a motion requesting that the State provide us any information regarding any deals or admonitions made with any of their witnesses.
>
> [TRIAL COURT]: It is my understanding they have done so.
>
> [DEFENSE COUNSEL]: That's correct. They provided us with that information.

Contrary to the appellant's claim, the record reflects that counsel ensured that these two motions were heard, with results favorable to the appellant.

As to the remaining motions, the record before us is inadequate for evaluation of counsel's performance. Although the trial court signed the order that required all pretrial motions and rulings in the companion case to be made part of the appellate record here, we see no evidence of the applicable trial court rulings in the record. The companion case complicates the issue because, clearly, discussions took place and decisions were made concerning both cases jointly, for which we have no record. The record indicates that the substance of at least some of the motions might have been the subject of off-the-record agreements between counsel and the prosecutor, and consequently these motions may have been disposed of without the need for a signed court order. For example, defense counsel made the following comment during a pretrial hearing in September, 2004:

> [DEFENSE COUNSEL]: There are a number–a good number of pretrial motions that we will be filing. . . . I think a good many of them [the prosecutor] and I may be able

---

[78] A third motion the appellant cites duplicates this motion in substance. Both were filed under the companion case.

to agree on, and we will certainly get together and do that. I think he'd be willing to do that.

Without a fully developed record, we can only speculate as to counsel's strategy. Further, the appellant has wholly failed to explain how he was prejudiced by any failure to pursue rulings and hearings on each of these motions. The appellant has failed to meet his burden to demonstrate deficient performance and prejudice.

*Failure to Request Post-Commitment Competency Hearing*

The appellant complains that counsel failed to request a competency hearing, before the trial court or a jury, following his return to the trial court after his release from the state hospital at Vernon.[79]

We can only speculate as to counsel's motivations. The psychological report from the state hospital, which was submitted to the trial court upon the appellant's return to Grayson County, found the appellant to be competent to stand trial. It also included a diagnosis of "malingering," explaining:

> He has clearly exaggerated symptoms that he might be experiencing, and may have even fabricated some symptoms of psychosis. It is possible that he may engage in gestures or behaviors, including possibly those involving self-harm, in a bid to appear more seriously mentally ill than he is, and to avoid the consequences of the current charges he faces.

It is possible that counsel anticipated that a competency challenge would reveal details of this sort that could damage the appellant's insanity defense to the extent that the harm would outweigh any potential benefit.

The appellant has provided no explanation for why counsel's representation was deficient and has failed to overcome the presumption that counsel's actions were sound trial strategy. He

---

[79] *See* Act of May 14, 2003, 78th Leg., R.S., ch. 35, § 1, 2003 Tex. Gen. Laws 57, 64 (amended 2005, 2007) (current version at CODE CRIM. PROC. art. 46B.084).

has failed to show a reasonable probability that the result of the proceeding would have been different if counsel had requested a competency hearing after the appellant's release from the state hospital.

*Failure to Effectively Present Insanity Defense*

The appellant complains that "counsel failed to request and obtain evaluations and opinions from Dr. James Harrison and Dr. Robin McGirk on the issue of appellant's sanity at the time the offense was committed." The trial court appointed Harrison to examine the appellant for the sole purpose of determining his competency to stand trial. Dr. McGirk met with the appellant several times in his capacity as the jail psychologist; he was not hired by either the State or the defense. Both were called to testify by the defense. Dr. Harrison believed that the appellant was schizophrenic, but he testified that he did not have enough information to render an opinion regarding the appellant's sanity at the time of the offense. Dr. McGirk also diagnosed the appellant as schizophrenic, but declined to give an opinion as to the appellant's sanity at the time of the offense.

The appellant has not shown how counsel's representation was deficient. Article 46.03, Sec. 3(g) permits the same expert to be appointed to evaluate competency and insanity, provided that the expert files separate reports. But counsel was by no means required or expected to solicit the same expert's opinion, in this case Dr. Harrison's, regarding both issues. The appellant also overlooks the fact that, in addition to obtaining approval for the appointment of Dr. Edward Gripon, counsel requested and was granted the services of another psychologist, Dr. Richard Rogers, to assist the appellant in preparing his insanity defense. Dr. Rogers evaluated the appellant and prepared a report but was never called to testify, for reasons that the record does not reveal.

The appellant has also failed to prove how counsel's performance prejudiced his defense. There is nothing to indicate that Dr. Harrison or Dr. McGirk would have testified to the appellant's legal insanity at the time of the offense had they been appointed specifically for the purpose of such an evaluation. In fact, Dr. Harrison testified under cross-examination that people with schizophrenia could still be legally sane.

The appellant further complains about counsel's performance with regard to Dr. Gripon. The trial court had appointed Dr. Gripon, in response to a defense motion, for the express purpose of assisting the appellant in the presentation of his insanity defense. The appellant alleges that counsel failed to elicit an opinion from Dr. Gripon, during his testimony, that the appellant was insane at the time of the offense. The record reflects otherwise. When asked his opinion "about what the mental status of [the appellant] was on the morning of March 27th, 2004," Dr. Gripon replied:

> I believe that he was operating under the effect of a psychotic illness at that time, specifically schizophrenia, in which he believed that he was doing what was directed by or that he was at least operating under the direction of God in fighting these demons, saving the world; that that was all based upon a psychosis, and that based upon that psychosis, he did not know that that conduct at that time was wrong.

The appellant has failed to meet his burden to demonstrate deficient performance and prejudice. He has failed to show a reasonable probability that the result of the proceeding would have been different if counsel had also requested sanity evaluations from Dr. Harrison and Dr. McGirk.

*Failure to Effectively Present Expert Testimony at Punishment*

The appellant alleges that counsel failed to give defense expert Dr. Kate Allen sufficient time and information to form and testify to her expert opinion about the appellant's sanity at the time of the offense. The trial court granted defense counsel's requested appointment of Dr. Allen,

a clinical social worker and family sociologist, as an expert witness on the punishment issue of future dangerousness. Dr. Allen testified that she interviewed the appellant and reviewed "documents that were relevant to looking at his childhood, his development, and his functioning." She testified that the appellant suffered from schizophrenia and that his mental illness was the "driving force" when he committed the instant offense. She opined that proper treatment and medication would reduce the appellant's risk of future dangerousness.

The appellant seems to argue that his trial counsel were ineffective in failing to obtain the services of Dr. Allen sooner than they did, so that she could have testified, not just as a punishment expert, but also as a guilt-phase expert on the issue of insanity. The order to appoint Dr. Allen was signed on February 23, 2005, and the trial began on February 25, 2005. Dr. Allen testified on March 10. Had trial counsel retained her services earlier, the appellant argues, she could have provided effective testimony on the issue of his insanity.

Due process entitles a capital defendant to expert assistance in developing a colorable claim of insanity.[80] Counsel for the appellant had retained the services of two mental-health experts for this very purpose. The appellant does not claim that those two experts were unqualified or inadequately prepared to help him develop his insanity claim. Nor does he claim that Dr. Allen possessed any incremental expertise necessary to his insanity defense that his other experts did not. That it now appears possible in hindsight that trial counsel could have supplemented the input of his experts on the issue of insanity with Dr. Allen's testimony, had they begun to prepare her sooner, does not mean they performed in a constitutionally deficient manner in failing to do so.

---

[80] *Ake v. Oklahoma*, 470 U.S. 68 (1985).

It is possible to interpret the appellant's claim to be, alternatively, that his trial counsel were ineffective for failing to retain Dr. Allen's services earlier so that she could have rendered an expert opinion at the punishment phase of trial with respect to the appellant's insanity as it bore particularly upon the punishment-phase issues. But it is apparent from Dr. Allen's punishment-phase testimony that she was sufficiently familiar with the nature and effects of the appellant's mental illness to testify effectively about its significance as a mitigating factor and its ameliorating impact upon his potential for future dangerousness. The jury had already rejected the appellant's insanity defense, and additional testimony about the issue of insanity, *per se*, could not have materially improved upon her punishment phase presentation. The appellant has failed to establish that his trial counsel were ineffective on this account.

The appellant has failed to show both that counsel's performance was deficient and that the lack of Dr. Allen's expert opinion on the insanity issue prejudiced him. He has failed to show a reasonable probability that the result of the proceeding would have been different but for counsel's alleged deficiency.

Point of error nine is overruled.

## JURY MISCONDUCT

In point of error ten, the appellant claims that the trial court erroneously denied his motion for new trial based on jury misconduct. He alleges that while the jurors were visiting with the trial judge and attorneys after punishment was assessed, they said they had discussed, during deliberations, wanting to hear true remorse from the appellant. The appellant argues that, because he had a constitutional right not to testify and that decision could not be used by a jury as

evidence of his guilt, Texas Rule of Appellate Procedure 21.3 entitles him to a new trial.[81]

However, in the hearing on the appellant's motion for new trial, Texas Rule of Evidence 606(b) operated to prevent the admission of jurors' testimony about their deliberations, and the motion was denied.

The appellant further urges this court to consider the constitutionality of Rule 606(b) as applied to this case. "Otherwise, jurors in other future death penalty cases will be free to continue to violate the Constitution by considering a defendant's failure to testify and show true remorse, without such a defendant having any way to develop and offer evidence of such jury misconduct." Several courts have upheld the constitutionality of Texas Rule 606(b) and the analogous federal provision. The United States Supreme Court has rejected a claim that Federal Rule 606(b) violated the Sixth Amendment guarantee to a fair jury trial.[82] The Texas Supreme Court has found that Texas Rule 606(b) violated neither federal due-process principles nor the right to a fair trial under the Texas Constitution.[83] And several Texas courts of appeals have upheld the Rule's constitutionality under provisions of both the United States and Texas constitutions.[84]

At the hearing on the motion for new trial, defense counsel was prepared to call witnesses to testify to the alleged misconduct. The State, anticipating that the appellant would call jurors,

---

[81] TEX. R. APP. P. 21.3 (g), (h).

[82] *Tanner v. United States*, 483 U.S. 107, 126-27 (1987).

[83] *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 374-75 (Tex. 2000).

[84] *E.g.*, *Dunklin v. State*, 194 S.W.3d 14, 19-20 (Tex. App.—Tyler 2006); *White v. State*, 181 S.W.3d 514, 524-26 (Tex. App.—Texarkana 2005); *Glover v. State*, 110 S.W.3d 549, 552 (Tex. App.—Waco 2003); *Richardson v. State*, 83 S.W.3d 332, 362 (Tex. App.—Corpus Christi 2002); *Sanders v. State*, 1 S.W.3d 885, 888 (Tex. App.—Austin 1999); *Hines v. State*, 3 S.W.3d 618, 622 (Tex. App.—Texarkana 1999).

objected under Rule 606(b), which prohibits juror testimony on matters concerning jury deliberations or affecting a juror's decisionmaking. The trial court sustained the objection.

Counsel also attempted to introduce into evidence a taped interview of one of the jurors, which the motion for new trial had purported to include comments regarding "the jury's desire to hear an expression of true remorse 'presumably from the Defendant.'" At the hearing, counsel explained that the tape did not say what he had previously understood it to say, and therefore offered the tape only for purposes of the appellate record. The prosecutor responded, "I think that the position of the defense is that this tape they referred to was an interview by Channel 12 of one of the jurors, Mr. Ulmer, and he talks about his jury service, the things that he believed were important in the evidence. That is not admissible." The trial court sustained the State's objection to the tape's being made part of the record.

Over the State's objection, the trial court allowed defense counsel to make a proffer of evidence in support of his motion. Defense counsel stated:

> Your Honor, it's my belief, if we were to call the foreperson of the jury in this style and cause, Kyle McCoy, that he would testify that he recalled after jury deliberations in this case, and after answering the special issues to the detriment of the defendant which resulted in the Court imposing a death sentence on him, that he wanted the defense to give something to the jurors to help them hang their hat on, and that one of these things would have been the expression of true remorse.
>
> The record will reflect whatever it reflects, as far as the testimony that was given, but it's my recollection that Nurse Natalie Sims that very morning testified that in October of 2003 [*sic*], she had made a memo and said that Mr. Thomas had expressed true remorse. In fairness, and for the Court's record, I think her response to Mr. Ashmore's questions, he said there was some things that occurred or happened after that time that made her question her judgment as to whether Mr. Thomas had expressed true remorse.
>
> Additionally, I think the record will show, or the testimony would show, that– the record, I suppose, in this case would show that there were several mental health experts that had testified that Mr. Thomas, in their interviews with him, would have said that he regretted what he did and that he was sorry for what he had done.
>
> With all of that in mind, Your Honor, the implication is that the jurors, as they sat there, or at least Mr. McCoy as he sat there, would have required the

defendant to take the stand in violation of his constitutional rights to say that he was sorry that he had done this. We think that that ended up with the jurors not following the Court's instructions. We think that's of constitutional magnitude, and we would ask the Court to grant us a new trial based on that, and I suppose I can address the other issues, but that's what the live testimony I think would have been had we been allowed to present that.

Rule 606 outlines circumstances under which jurors may and may not testify as witnesses. Rule 606(b), entitled "Inquiry Into Validity of Verdict or Indictment," provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

The appellant does not assert that an outside influence was improperly brought to bear upon any juror, nor does he rebut a claim that a juror was not qualified to serve. He essentially argues that at least one juror considered his failure to testify when deciding whether to convict him. Under Rule 606(b), jurors are prohibited from testifying on this basis.[85] The trial court did not abuse its discretion in denying the appellant's motion for a new trial. The application of Rule 606(b) did not violate the appellant's constitutional rights. Point of error ten is overruled.

We affirm the judgment of the trial court.

Delivered October 8, 2008.
Do not publish.

---

[85] *See Hines,* 3 S.W.3d, at 621 (Tex. App.—Texarkana 1999) (stating that under Rule 606(b), jurors are not competent to testify "that they decided the verdict by lot, that they decided the case based on another juror's incorrect statement of the law, or that they discussed the defendant's failure to testify and used that failure as a basis for convicting him").