James Blake COLBURN, Appellant,

v.

The STATE of Texas.

No. 72236.

Court of Criminal Appeals of Texas,
En Banc.

Feb. 25, 1998.

William E. Hall, Jr., Conroe, for appellant.

Michael A. McDougal, Dist. Atty., Gail Kikawa McConnell, Asst. Dist. Atty., Conroe, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MEYERS, Judge, delivered the opinion of the Court in which McCORMICK, Presiding Judge, MANSFIELD, KELLER, PRICE, HOLLAND and WOMACK, Judges, joined.

Appellant was convicted of capital murder committed in Montgomery County on or

about June 26, 1994. TEX. PENAL CODE ANN. § 19.03(a). The jury answered the punishment issues set out in Texas Code of Criminal Procedure Article 37.071 § 2 and the trial court sentenced appellant to death as required by Article 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Article 37.071 § 2(h). We previously abated this appeal,[2] and now reinstate it and affirm the judgment of the trial court.

Appellant raises five points of error, but does not challenge the sufficiency of the evidence at either stage of trial. Therefore, we dispense with a recitation of the facts and address the points of error in the order they are presented.

In appellant's first point of error, he contends the trial court abused its discretion in sentencing appellant to death because he has an extensive history of paranoid schizophrenia. He argues the imposition of the death sentence on a severely mentally ill person violates the Eighth and Fourteenth Amendments to the United States Constitution, Article I, Section 13 of the Texas Constitution, and Article 1.09 of the Texas Code of Criminal Procedure (regarding cruel or unusual punishment). In particular, appellant points to *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), in which the Supreme Court held the Federal Constitution "prohibits the State from inflicting the penalty of death upon a prisoner who is insane." Appellant further argues imposition of the death penalty violates the Eighth Amendment because we have not articulated a legal standard by which to determine if a capital defendant is "insane" and may not therefore be executed.

■ *Ford, supra,* and related authority proscribe the *execution* of an *insane* person, not the *imposition of sentence* on a *mentally ill* person. The fact that appellant had a mental illness when he was tried and sentenced is not determinative of whether he

will be sane at the moment of his execution. The proper time to argue the issue presented in appellant's first point of error is after appellant has been sentenced to death and his execution is imminent. That would also be the proper time for this Court to articulate the applicable standard for determining a capital defendant's sanity for purposes of addressing a *Ford* claim. Thus, appellant's Federal Constitutional claim is not yet ripe and is not properly before this Court in the instant appeal. Further, we note that the psychiatric evaluations and other information necessary to evaluate appellant's sanity at the time of execution will not necessarily be found in the record from trial. A record of such evidence is best developed in the context of a hearing held in relation to an application for writ of habeas corpus. *Cf. Ex parte Torres,* 943 S.W.2d 469, 475 (Tex.Crim.App.1997)(recognizing that "[i]n most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim" and stating that while generally a claim previously raised and rejected on direct appeal is not cognizable, this doctrine should not apply "where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding"). Appellant's first point of error is overruled.

In his second point of error appellant claims the trial court abused its discretion in finding there was no valid marriage between appellant and Martha Colburn ("Martha") prior to January 11, 1990, when the couple filed a written declaration of informal marriage pursuant to Texas Family Code Section 1.92 (Vernon 1993). Appellant argues the couple had been informally married since August 4, 1988, which is the marriage date given in the informal marriage declaration. Appellant contends that because this was a

---

1. Any reference to articles will be to those in the Texas Code of Criminal Procedure in effect at the time of the offense unless otherwise indicated.

2. The appeal was abated pursuant to a motion of appellate counsel to withdraw. Appellant's brief had already been filed and oral argument made. Appellate counsel was permitted to withdraw

and new appellate counsel was appointed. Newly appointed counsel filed a Supplemental Brief in which he adopted the original brief and supplemented it with two additional "issues" or points of error. The points of error from the original brief and the supplemental points of error are addressed in this opinion.

valid common law marriage, the trial court should not have compelled Martha to testify against appellant at the punishment phase of trial regarding certain events which occurred in 1989 and early 1990, in violation of her testimonial privilege under Rule 504 of the Texas Rules of Criminal Evidence.[3]

Under Rule 504 the spouse of the accused has a privilege not to be called as a witness for the State. TEX.R.CRIM. EVID. 504(2)(a). This privilege does not extend to matters occurring prior to the marriage. TEX. R.CRIM. EVID. 504(2)(b). Appellant and Martha were never ceremonially married; therefore, appellant had to prove that a common law marriage existed at the time of the events to which Martha testified. *See Welch v. State,* 908 S.W.2d 258, 264–265 (Tex. App.—El Paso 1995, no pet.); *Anderson v. State,* 880 S.W.2d 35, 37 (Tex.App.—Tyler 1994, pet. ref'd)(defendant has burden of proving that witness is common law spouse for purpose of excluding testimony under marital privilege).

Section 1.91 of the Texas Family Code provides in part that:

(a) In any judicial, administrative, or other proceeding, the marriage of a man and woman *may be proved* by evidence that:

(1) a declaration of [the] marriage has been executed under Section 1.92 of this code; or

(2) they agreed to be married, and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.

TEX. FAM.CODE ANN. § 1.91(a)(Vernon 1993)(emphasis added). Section 1.92, *Declaration and Registration,* requires that the written declaration referred to in subsection (a)(1) above, contain the following oath:

I SOLEMNLY SWEAR (OR AFFIRM) THAT WE, THE UNDERSIGNED, ARE MARRIED TO EACH OTHER BY VIRTUE OF THE FOLLOWING FACTS: ON OR ABOUT (DATE) WE AGREED TO BE MARRIED, AND AFTER THAT DATE WE LIVED TOGETHER AS HUSBAND AND WIFE AND IN THIS STATE WE REPRESENTED TO OTHERS THAT WE WERE MARRIED. SINCE THE DATE OF MARRIAGE TO THE OTHER PARTY I HAVE NOT BEEN MARRIED TO ANY OTHER PERSON. THIS DECLARATION IS TRUE AND THE INFORMATION IN IT WHICH I HAVE GIVEN IS CORRECT.

A properly recorded declaration of informal marriage constitutes *prima facie* proof of the informal marriage. TEX. FAM.CODE § 1.94(d)(Vernon 1993); *Russell v. Russell,* 865 S.W.2d 929, 931 (Tex.1993). Thus, the trial court may find the common law marriage proven based upon the declaration alone, but evidence may be offered rebutting the existence of the marriage as sworn to or stated in the declaration. In other words, the trial court is not bound to find a marriage as stated in the declaration when there is evidence to the contrary. In reviewing the trial court's ruling in this regard, as with other questions concerning the admissibility of evidence, we apply an abuse of discretion standard. *See* TEX.R.CRIM. EVID. 104(a); *McVickers v. State,* 874 S.W.2d 662, 664 (Tex. Crim.App.1993).

The trial court admitted into evidence, at appellant's request, a written declaration of informal marriage that complied on its face with the requirements in section 1.92. The declaration was executed on January 11, 1990, and stated in part as follows:

I solemnly swear (or affirm) that we, the undersigned, are married to each other by virtue of the following facts; on or about August 4, 1988, we agreed to be married, and after that date we lived together as husband and wife and in this State we represented to others that we were married. . . .

To challenge appellant's *prima facie* showing of common law marriage based upon the declaration, the State offered Martha's testi-

---

**3.** Martha testified regarding an incident where appellant threw a motorcycle helmet at her in December of 1989 and a "rassle tassle" in which appellant kicked her with his cowboy boots while she was lying on the ground sometime in 1989.

She also testified about appellant's arson conviction for setting fire to her trailer which occurred at some point immediately prior to January 11, 1990.

mony, in which she indicated that she and appellant did not live together during the relevant time period, and that they were "common law married" on January 11, 1990, not August 4, 1988:

> The State: Before you moved into the trailer that ended up getting burned down, before that, did you ever live with [appellant]?
>
> The Witness: No, sir.
>
> The State: *So really you never have lived with [appellant], have you?*
>
> The Witness: *Well, we have been separated due to the prison time and everything else. That is true. We have been separate more than we have ever been together, but when we were together, we really loved each other.*
>
> The State: You got married before he went to prison for arson, right?
>
> The Witness: I got married on the day that he got his time and was definitely going to be sent away, so I would know I had papers on him anyway.
>
> The State: And after the trailer burned, you lived where you live now, with the people you live with now, didn't you?
>
> The Witness: After the trailer burned, yes, sir.
>
> The State: And you have lived there ever since the trailer burned, haven't you?
>
> The Witness: Yes, sir.
>
> The State: *And except for staying a few nights with you and that sort of thing, your husband never has resided there with you, has he?*
>
> The Witness: *No, not actually, you know.*
>
> The State: When he got out of prison for arson, he didn't move in with you, did he?
>
> The Witness: When he got out of arson [sic]? He got him an apartment and I cannot live with him because I had my two dogs and they don't allow pets or either you have to be a rich person to be able to pay the deposit to be able to have the pets.
>
> The State: *And after he got out of the Federal prison, he didn't live with you then either, did he?*
>
> The Witness: *No, sir. It is generally nearly always been the same reason, due to me having my pets and different, you know, reasons that, you know, had conflict with us being able to be together.*

(emphasis added). On cross-examination by the defense, Martha stated that she had lived with appellant "off and on, you know, whatever, up until we finally managed to be legally married.... January 11th, 1990." Martha also testified that she and appellant celebrated August 7th or 9th, 1988, as their "getting acquainted day" and she referred to the day they knew appellant was going away to prison for arson (in January of 1990) as the day she got married. When asked if the August date was the day she and appellant agreed to be married Martha said:

> Well, it's when I fell head over heels. I suppose so.... Because he was telling everybody I'm going to marry her, I love her and everything, you know, just as soon as we can get around to it.

Common law marriage requires that there be some agreement presently to be married, not to marry sometime in the future. *See Texas Employers' Ins. Ass'n v. Borum,* 834 S.W.2d 395, 399 n. 3 (Tex.App.—San Antonio 1992, writ denied). From Martha's testimony, it was reasonable for the trial court to infer that she and appellant merely intended to marry sometime in the future and did not consider themselves actually married until they filed the declaration. Neither was it unreasonable for the trial court to conclude that Martha and appellant spent time together when possible, but never lived together as husband and wife. While the declaration was *prima facie* evidence of a common law marriage, the trial court did not abuse its discretion, based on Martha's testimony, in concluding that appellant and Martha did not in fact have a common law marriage on the date stated in the declaration. Therefore, the trial court did not abuse its discretion in compelling Martha to testify at punishment as to events which occurred prior to this date. Appellant's second point of error is overruled.

In his third point of error, appellant argues the trial court erroneously refused his

requested instruction concerning the application of Texas parole law. Appellant objected to the jury charge at punishment for failure to include an instruction on Texas parole law and requested the following instruction:

> Under the law applicable in this case, if the defendant is sentenced to a term of life imprisonment, he will not become eligible for parole until he has actually served forty (40) years. Eligibility for parole does not guarantee that parole will be granted.

The trial court denied appellant's request and did not include an instruction informing the jury of the length of time appellant would serve before becoming eligible for parole under a life sentence. Both parties agreed to say nothing in final arguments inconsistent with the proposition that "life means life." During deliberations, the jury sent the following written question to the trial court: "[g]iven a life sentence, is there a possibility of parole in this case?" The trial court responded:

> Under the Texas Constitution, the jury is prohibited from considering parole in any manner when considering whether a Defendant should be sentenced to life or death. You are instructed, therefore, to follow the law of this state and not consider parole in any manner.

Appellant contends the trial court's actions described above violated the Eighth and Fourteenth Amendments to the United States Constitution, Article I, Section 19 of the Texas Constitution.[4]

■ We have repeatedly held that parole eligibility is not a proper consideration at sentencing in a capital case. *See, e.g., Santellan v. State*, 939 S.W.2d 155, 170 (Tex. Crim.App.1997); *Ford v. State*, 919 S.W.2d 107, 116 (Tex.Crim.App.1996); *Smith v. State*, 898 S.W.2d 838, 846 (Tex.Crim.App. 1995) (plurality opinion), *cert. denied*, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). This Court has repeatedly held the trial court does not violate the United States Constitution or the Texas Constitution in refusing to give such an instruction. *Green v. State*, 934 S.W.2d 92, 105 (Tex.Crim.App.

1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997); *Smith*, 898 S.W.2d at 846; *see also Cantu v. State*, 939 S.W.2d 627 (Tex.Crim.App.1997). Further, the trial court is permitted to instruct the jury *not* to consider parole laws in sentencing. *Green*, 934 S.W.2d at 106.

Appellant acknowledges that precedent from this Court weighs heavily against him on all constitutional grounds (citing *Smith, supra*), but urges that we reconsider our prior opinions in light of the great similarity between the facts of his case and *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

In *Simmons*, the Supreme Court reversed a capital defendant's death sentence on due process grounds where future dangerousness was at issue. The Court's holding was based on the facts that the trial court did not instruct the jury about eligibility for parole, the defendant was prevented from informing the jury that he was ineligible for parole under state law, and the state led the jury to believe the defendant could be released on parole. *Id.* In *Smith, supra*, we refused to apply *Simmons*, based upon several critical distinctions between our sentencing scheme and that applicable in *Simmons*. We first noted that *Simmons* on its face appeared "to be limited to states which have life without parole and not to states which have life with parole eligibility." In Texas, a life sentence does not mean life without parole. Further, in *Simmons*, the State injected information before the jury suggesting a possibility of parole that the defendant did not have the opportunity to rebut or explain. In addition, South Carolina juries determine whether the defendant should get a life sentence or death. The *Simmons* jury was under a potentially mistaken belief that it had to choose between death and a limited period of incarceration. Finally, in Texas, defense counsel is permitted to question prospective jurors about their ability to obey an instruction forbidding the consideration of parole in deliberations. *Smith*, 898 S.W.2d at 848–53; *see also Santellan, supra; Shannon v. State*, 942 S.W.2d

---

4. Appellant also argues the trial court's conduct violated Article 1.09 of the Texas Code of Criminal Procedure. However, we will not consider appellant's Article 1.09 argument, as he did not object on this basis at trial. Tex.R.App. P. 33.1(a).

591 (Tex.Crim.App.1996); *Eldridge v. State,* 940 S.W.2d 646 (Tex.Crim.App.1996). Appellant argues the current Texas law requiring that a defendant sentenced to life imprisonment serve 40 years before becoming eligible for parole is tantamount to life without parole in his case, considering his age (35 years), ill health, and past drug use. *See* Article 42.18(8)(b)(2). We disagree. These facts do not elevate Texas law to the level of life without parole present in South Carolina. Further, they do not negate the other distinguishing factors discussed in *Smith, supra.* Appellant's third point of error is overruled.

In his fourth point of error, appellant contends the trial court improperly sustained the State's challenge for cause to prospective juror J. Bishop because of his religious scruples against capital punishment, in violation of his rights under Amendments Six and Fourteen of the United States Constitution, and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[5] In his second supplemental point of error, appellant makes the same assertion regarding prospective juror T. Wertz. We will address these points together.

A veniremember may not be struck for cause merely because he is opposed to the death penalty. *Witherspoon,* 522–23, 88 S.Ct. at 1777; *Rachal v. State,* 917 S.W.2d 799, 810 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996). Prospective jurors who oppose the death penalty, but would follow the law and honestly answer the special issues, are not challengeable. *Ramos v. State,* 934 S.W.2d 358, 368 (Tex.Crim.App.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997); *Riley v. State,* 889 S.W.2d 290, 296 (Tex.Crim.App.1993), *cert. denied,* 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995). However, a venireman may be struck if his views prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and the juror's oath.

*Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Rachal, supra.*

In reviewing the trial court's decision to dismiss a venireperson upon a sustained challenge for cause, considerable deference is given to the trial court because it is in the best position to evaluate the venireman's demeanor and responses. *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841 (1985); *Chambers v. State,* 866 S.W.2d 9, 22 (Tex.Crim.App.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). In reviewing the trial court's action, we ask whether the totality of the voir dire testimony supports the court's finding that the prospective juror is unable to follow the law as instructed, and reverse only if a clear abuse of discretion is evident. *Chambers, supra.* When the potential juror's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Rachal* and *Chambers, supra.* And, when the venireman is persistently uncertain about his ability to follow the law, we will not second guess the trial court. *Rachal, supra.*

In the instant case, prospective juror Bishop said his church opposed the death penalty and initially stated that his religious beliefs would substantially impair him in his ability to give the death penalty. Upon further questioning by the defense, he said that he could answer the punishment questions based on the evidence. However, when the State questioned him again about whether his personal moral opposition to the death penalty "would interfere in how you are going to answer these questions," Bishop answered:

> Well, I think it probably would. I would love to say that it would not, but I know it would to some degree. Because if I answered both of the questions, then I would have to deal with if he got the death penalty [sic].

---

5. Although appellant also cites Article I, Sections Ten and Thirteen of the Texas Constitution and Article 1.05 of the Texas Code of Criminal Procedure, in support of this point of error, he bases his argument only on *Witherspoon, supra.* He does not articulate separate arguments under the

Texas Constitution or Texas Code of Criminal Procedure. We will only address the arguments discussed by appellant in his brief. Tex.R.App. P. 38.1(h); *see also Riddle,* 888 S.W.2d at 7–8; *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim. App.1992).

The State followed up by asking him if his view would "substantially interfere with how you would answer these questions even though you would try to be fair and base it on the evidence?" Bishop responded:

> To be honest about it, it probably would. Like I say, I could answer the questions, but I don't want to take a chance of my religion misleading it.

Thus, Bishop vacillated as to whether he could follow the law and answer the punishment questions based on the facts and whether his religious and moral conviction against the death penalty would bias his answers to those questions. In such situations, we defer to the trial court's discretion. *See Rachal* and *Chambers, supra.* Appellant's fourth point of error is overruled.

■ While prospective juror Wertz was personally opposed to the death penalty, he nevertheless stated he would try to answer the questions fairly and in accordance with the law and his oath. Upon further questioning, however, Wertz stated, as to the mitigation special issue, "There would probably be mitigating circumstances. Personally, *I feel there would always be.*" (emphasis added). This position was based upon Wertz's "view about the death penalty and [his] religion."

We recently upheld a challenge for cause in a nearly identical situation. *Smith v. State*, 907 S.W.2d 522 (Tex.Crim.App.1995). In *Smith*, when the challenged prospective juror was questioned about the mitigation special issue he said, "to me, there are always mitigating circumstances in the nature of life. And so I could honest—I can't imagine a situation in which I would say that there aren't any mitigating circumstances." *Id..* In other words, "By the veniremember's definition, he would be following the law and his oath, even if always answering the mitigation issue in the affirmative, thereby mandating the trial court to assess a life sentence." *Id.* at 529. We upheld the trial court's deci-

sion to sustain the challenge for cause, pointing to *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), where the Supreme Court said that jurors, "whether they be unalterably in favor of or opposed to the death penalty in every case—by definition are ones who cannot perform their duties in accordance with the law, their protestations notwithstanding." *See also Staley v. State*, 887 S.W.2d 885 (Tex.Crim.App. 1994), *cert. denied*, 514 U.S. 1020, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995). Wertz's position is virtually identical to the views of the prospective juror at issue in *Smith*. Taking his voir dire as a whole, we cannot say the trial court abused its discretion in sustaining the State's challenge for cause. Appellant's second supplemental point of error is overruled.

In his fifth point of error, appellant asserts the trial court abused its discretion in denying his motion to suppress evidence obtained as a result of an illegal search of appellant's residence, in violation of his rights under the Fourth Amendment to the United States Constitution and Article 38.23 of the Texas Code of Criminal Procedure (excluding illegally obtained evidence).[6]

The record reveals that appellant went to his neighbor's apartment and asked the neighbor to call the police because appellant had just killed "that girl." The neighbor initially did not believe appellant, then relented and called the police when appellant continued to insist that he had killed a girl. Deputy Larry Demanche responded to a "welfare check" or "welfare concern" call and spoke with appellant's neighbor. Appellant's neighbor directed him to appellant's apartment, where the door was standing open. Deputy Demanche made an immediate, warrantless entry into appellant's apartment based on this information. He discovered the dead body of the victim in the bedroom, then exited without searching further. At this point, Demanche went to appellant's

---

**6.** Appellant's motion to suppress focused only on the legality of appellant's *arrest*, although appellant also challenged the *search* of his residence at the suppression hearing. The trial court ruled on the admissibility of both appellant's statements obtained after his arrest and evidence obtained as a result of the search of his apartment.

In this appeal, appellant only challenges the legality of the search, not the arrest.

Appellant also claims the search violated article I, Section Nine of the Texas Constitution, but because he does not provide separate authority or argument for his Texas constitutional claim, we decline to address it.

neighbor's apartment and arrested appellant who met him at the door. Demanche entered appellant's apartment once more to make sure there was no rear door to the apartment, but, again, did not process the scene for evidence.[7] Later, police obtained appellant's consent to search the apartment and obtained a search warrant before processing the scene and seizing any physical evidence.

■ Although the Fourth Amendment to the United States Constitution generally prohibits warrantless searches, both the Supreme Court and this Court have recognized that in limited situations an immediate search without a warrant is reasonable where a risk of injury or death exists. *Brimage v. State*, 918 S.W.2d 466, 500–501 (Tex.Crim.App.1996)(opinion on reh'g), *cert. denied*, 117 S.Ct. 115 (1996); *see also Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, (1978). This exception, known as the Emergency Doctrine, or the Exigent Circumstances Doctrine, allows an immediate, warrantless search where a police officer has reasonable cause to believe that, if the search were delayed to obtain a warrant, serious bodily harm or death might result. *Brimage, supra.* We apply an objective standard of reasonableness in determining whether a warrantless search is justified, taking into account the facts and circumstances known to the police at the time of the search. *Id.* at 501.

■ In this case, Demanche received a call to perform a "welfare check" on a reported homicide. He was informed that appellant claimed he had just killed a girl in his apartment and had requested his neighbor call the police. Appellant also told the neighbor the girl was still in the apartment. Although there was reason to believe that the victim was already dead, a reasonable officer under the circumstances might have thought there was a possibility that the victim might still be alive, but seriously injured. Thus, we

hold Demanche's search of the apartment was justified under the Emergency Doctrine. Appellant's fifth point of error is overruled.

In his first supplemental point of error, appellant contends the trial court erred in failing to grant his motion for mistrial based on allegations of "patent juror misconduct," during the sentencing phase of trial.[8]

During deliberations the jury sent out a note which read, "Given a life sentence, is there a possibility of parole in this case?" The trial court's reply read:

> Under the Texas Constitution, the jury is prohibited from considering parole in any manner when considering whether a Defendant should be sentenced to life or death. You are instructed, therefore, to follow the law of this state and not consider parole in any manner.

Appellant objected to the trial court's response as indirectly informing the jury that appellant would be eligible for parole. Appellant further moved for a mistrial on the ground that the jury was considering parole in deliberation. Appellant's objection and motion for mistrial were overruled.

■ Under Texas law, parole is not a proper topic for jury deliberation. *See, e.g., Smith v. State*, 898 S.W.2d 838, 849 (Tex.Crim.App.)(Texas Constitution prohibits jury consideration of parole during sentencing phase of capital murder trial unless legislature enacts laws to contrary), cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). We have previously recognized that a jury note regarding parole suggests that jurors are "discussing" and "considering" parole. *Arnold v. State*, 786 S.W.2d 295, 305 (Tex.Crim.App.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990). Not every mention of parole, however, warrants a drastic remedy. *See, e.g., Sneed v. State*, 670 S.W.2d 262 (Tex.Crim.App.1984)(for jury discussion of parole to be reversible error, appellant must show there was (1) misstatement of law; (2) asserted as fact, (3) by one

---

7. Although appellant directs us to Demanche's testimony about this second trip into appellant's apartment, he does not provide any argument regarding the legality of this entry. Hence, we limit our discussion to Demanche's first search of the apartment. Tex.R.App. P. 38.1(h).

8. Some of appellant's supplemental brief is devoted to his request at trial for a truth-in-sentencing charge. We addressed the trial court's failure to include such charge in connection with appellant's third point of error and we need not duplicate that analysis.

professing to know the law; (4) relied upon by other jurors, and (5) who for that reason changed their vote to a harsher punishment).

■ The trial court's reply or supplemental jury instruction was a correct statement of the law. Contrary to appellant's assertion, it did not inform the jury that appellant "will be eligible for parole." The jury was simply told "not [to] consider parole in any manner." There is no implication in this statement as to the applicability of parole to appellant.

■ We generally presume the jury follows the trial court's instructions in the manner presented. *See Williams v. State,* 937 S.W.2d 479, 490 (Tex.Crim.App. 1996)(jury presumed to follow court's instructions as given); *Waldo v. State,* 746 S.W.2d 750 (Tex.Crim.App.1988)(jury presumed to follow instruction to disregard evidence); *Gardner v. State,* 730 S.W.2d 675, 696 (Tex. Crim.App.), *cert. denied,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987). The presumption is rebuttable, but appellant has pointed to no evidence in rebuttal. Appellant did not file a motion for new trial alleging juror misconduct or obtain a hearing to adduce facts not in the record. As such, the only evidence that the jury considered parole is the jury note. Even if the note constitutes evidence the jury discussed parole *at a preliminary point,* we presume they followed the court's instructions and thereafter did not consider it in reaching their verdict.

Appellant says the jury's consideration of parole deprived him of a "fair trial." In light of the court's proper instruction, we presume the jury did not consider parole. The trial court did not abuse its discretion in its supplemental instructions to the jury and in its denial of appellant's motion for mistrial. Appellant's first supplemental point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

BAIRD, J., dissents to the decision to publish this opinion believing it adds nothing to the jurisprudence of this State.

OVERSTREET, Judge, concurring and dissenting.

I dissent to the majority's holding on point three, which avers error by the trial court in refusing to submit appellant's requested punishment jury charge instruction regarding parole law, i.e. that he would not become eligible for parole on a life sentence until he had served 40 years. In view of his age, he would not have become parole eligible until he was over 70 years old. Surely such a fact would be relevant to the jury's determination of the future dangerousness special issue. And as the majority notes in its discussion of appellant's supplemental point of error, the jury expressed just such concern during deliberations by asking the trial court whether parole was a possibility in this case. Such is proof positive of the acuteness of this error.

I continue to dissent to the majority's treatment of this issue. *See, e.g., Smith v. State,* 898 S.W.2d 838 (Tex.Cr.App.1995)(plurality opinion), *cert. denied,* 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995); *Morris v. State,* 940 S.W.2d 610 (Tex.Cr.App.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2461, 138 L.Ed.2d 218 (1997). As I discussed in some detail in my dissent to *Rhoades v. State,* 934 S.W.2d 113, 131–44 (Tex.Cr.App. 1996), in light of the United States Supreme Court's holding in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), I believe that the United States Constitution's guarantees of due process required appellant's jury be informed of the forty year parole eligibility law.

I also note that four members of the United States Supreme Court have recently commented upon the "[p]erverse[ness]" of our death penalty scheme not letting the jury know when the defendant will become eligible for parole if he is not sentenced to death. *Brown v. Texas,* —— U.S. ——, 118 S.Ct. 355, 139 L.Ed.2d 276 (1997). I likewise find rather perverse this Court's continued approval of keeping jurors ignorant and uninformed of such a critical legal fact when making life and death decisions as to whether the death penalty will be assessed. Capital jurors deserve to be so informed so that they can make an informed decision. Hopefully a majority of this Court will soon realize this; before the

Supreme Court explicitly informs us via a myriad of our opinions being reversed.

I respectfully dissent to the majority's discussion and holding as to point of error number three. Otherwise, I concur in the disposition of all the other points.