

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00059-CR

LARRY KEVIN BONNER                                                      APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

------------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

Appellant Larry Kevin Bonner appeals his conviction for three counts of aggravated robbery with a firearm. In three issues, Bonner contends that the trial court abused its discretion by not allowing him to question a State's witness regarding the witness's prior conviction for possession of marijuana and deferred adjudication regarding the delivery of a controlled substance; that the trial court

------------

[1]See Tex. R. App. P. 47.4.

erred by not granting a mistrial at the punishment phase after the trial court sustained his objection to one of the prosecutor's closing remarks; and that he received ineffective assistance at trial. We will affirm.

## II. BACKGROUND

Tamika Jones and her husband were loading their car for a trip on the morning of April 18, 2008. Jones observed a silver Monte Carlo quickly pull into her neighbor's driveway across the street—Curtis Bailey's driveway. Three men dressed in black with bandana-covered faces jumped out of the car, went to the door of Bailey's home, banged on the door, and yelled that they were the police. Frightened, Jones told her husband to close the garage door. She then went upstairs and watched Bailey's home from an upstairs window as she called 911. Jones observed the three men kick in the door. Next, Jones heard five or six gunshots. She then saw the three men run outside, get back in the car, and drive away. Jones recalled that Bailey, "came out of his house, and he was all bloody and he had been shot."

Bailey testified that he was home sleeping that morning. Bailey's girlfriend, Angel Chapman, was with him in the bedroom, and Bailey's cousin—Kevin Johnson—and Johnson's son were in the front of the house. Bailey said that he heard banging on the front door and yells of "task force." Next, Bailey heard Johnson say, "Let my son go." Bailey also heard an unknown person demand, "Where is the money?" Bailey said that at that time he knew the intruders were not the police: "[W]hen I heard them say where is the money, I knew it wasn't the

2

police."  Bailey next heard Johnson yell, "My mom and dad [are] in their room.  Please don't kill them.  There's some money on top of the dresser."

Bailey said that he knew this was Johnson's cryptic way of warning him.  Bailey recalled that he told Chapman "to go to the restroom and call 911" and then someone "knocked on the door, was trying to come through the door, and I started shooting rapidly."  The intruders shot back, and Bailey was shot.

Bailey said, "It just got quiet all of a sudden."  At that point, Bailey left his bedroom and looked for Johnson and Johnson's son, but they were no longer in the house.  Bailey continued his search outside when Jones and her husband came over to help him.  Emergency personnel took Bailey to the hospital.  Bailey admitted that he initially lied to police about owning and firing his gun and, because he feared Johnson had a warrant out for his arrest, he told police that Johnson's name was Clarence.  Bailey said he never saw the perpetrators' faces.

The prosecutor asked Bailey if he ran a snow cone stand.  Bailey said that he ran a snow cone stand and did lawn work.  Bailey testified that he did not know why the perpetrators chose his house.  On cross-examination, defense counsel asked whether Bailey had ever had any other occupations besides running the snow cone stand and his lawn business.  Bailey answered no.  Defense counsel then asked to approach the bench.  The trial court then asked the jury to step out of the courtroom.

Defense counsel stated that he wanted to impeach Bailey's testimony. Defense counsel's argument was that he should be allowed to introduce evidence admitted in a prior case where Bailey received deferred adjudication in a delivery of a controlled substance charge. Specifically, defense counsel contended that Bailey's prior admission for delivering a controlled substance was an inconsistent statement with his testimony that he had never held any other occupations besides the two testified to. The trial court sustained the State's objection.

Defense counsel then took Bailey on voir dire, where Bailey confirmed that he did judicially admit to delivery of a controlled substance in 1997. Defense counsel then asked the court for a ruling regarding his desire to address, in front of the jury, an outstanding warrant that Bailey had at the time of trial. The warrant was in relation to an unpaid fine regarding a prior conviction Bailey had for possession of marijuana. The trial court ruled that defense counsel could not introduce evidence of the marijuana conviction or the warrant because the conviction was indeed a past final conviction that is neither a felony nor a crime of moral turpitude.

Chapman testified that she and Bailey were in the bedroom that morning when she heard a loud noise. She said that she heard men yelling "police" but warned Bailey that she did not believe it was the police and advised Bailey to get his gun. She went into the bathroom to call the police, and then she heard

4

gunshots. Bailey came into the bathroom, saying that he had been shot, and Chapman noticed a hole in his shirt and blood.

Johnson testified that he and his son had spent the prior evening at Bailey's house. The next morning, Johnson heard banging on the front door and saw three guys burst into the house, yelling that they were part of a task force and ordering everyone to the ground. Johnson's three-year-old son was sitting at the table eating cereal. Johnson initially thought that the men were coming to arrest him, but then Johnson noticed that the men were not police because of their attire. At that time, one of the men, who was unmasked, pointed a gun at Johnson and demanded to know where the money was. Johnson replied he didn't have any money. While pointing the gun toward the three-year-old's head, the gunman, whom Johnson later identified as Bonner, told Johnson that if he did not tell him where the money was, he was going to "blow" the "noodles and cereal out of" the child's head.

Johnson explained that in order to free his son from Bonner's grasp, he told Bonner that his "mom and daddy" had money with them in the bedroom. As one of the other intruders went down the hall to the bedroom, Johnson heard gunshots. Johnson grabbed his son and ran out the back door. Once the police arrived, Johnson returned to Bailey's home. But, because he had a warrant out for his arrest, Johnson told the police his name was "Clarence." Once the police determined who he was, they arrested him.

5

Ryan Aust, a paramedic at Harris Southwest Hospital, testified that he was working that morning when Bonner told him that his friend had been shot and needed his help. Aust took a wheelchair to an injured man in the passenger seat of Bonner's car. The man was bloodied, unconscious, and barely breathing. The man, later identified as Edward Robinson, died a short time later. Dr. Gary L. Sisler, who performed the autopsy on Robinson, said that Robinson had been shot in the right side of his chest and that his death was a homicide.

Officer Timothy Hennessy, a patrol officer for North Richland Hills, said that he was at the hospital with his wife when he saw Bonner get out of a silver Monte Carlo and call out for help. Hennessy saw an unconscious man in the right front passenger seat, and Hennessy questioned Bonner about what had transpired. According to Hennessy, Bonner told him that the injured passenger had been shot at a park. Hennessy asked Bonner whose car it was, and Bonner responded that he did not know who owned the car, which Hennessy noticed had a buyer's tag on it. Hennessy patted Bonner down and took the car keys from him. Hennessy instructed Bonner to sit on the curb, but Bonner jumped up and started to run away. Hennessy pursued him, eventually restraining him until other officers arrived.

Fort Worth police officer Robert Hill said that he impounded the Monte Carlo. Hill and another officer found a spent bullet outside the entrance to the ER. The bullet matched Bailey's gun. Police also found blood in the Monte Carlo and Bonner's wallet. Detective Brent Johnson of the Fort Worth homicide

6

unit testified that he interviewed Bonner on the day of the shooting. Bonner told Johnson that Robinson had been shot in a park while the two of them were talking to some girls. Johnson also testified that he investigated Bonner for felony murder because of the manner and circumstances surrounding Robinson's death.

The jury returned a verdict of guilty, and the trial proceeded to the punishment phase. During closing arguments at the punishment phase, the following exchange occurred:

> [Prosecutor]: Whatever [Bonner] was learning [where he grew up] just made his offense become more and more severe, and lastly, as violent as it can get, one step away from murder. And we heard the definition of murder was met in this case. Because in a violent crime, a commission of that intent with that gun in his hand, Edward Robinson was killed. So it was murder.
>
> [Defense Counsel]: Your Honor, object to that. The DA's office specifically declined to prosecute him for murder.
>
> [Trial Court]: Sustained.
>
> [Defense Counsel]: We ask that the jury be instructed to disregard.
>
> [Trial Court]: Disregard.
>
> [Defense Counsel]: And we respectfully ask for a mistrial.
>
> [Trial Court]: Denied.

After both parties closed, the jury found true a repeat offender paragraph and assessed punishment at thirty-three years' confinement on each count. The trial court entered judgment accordingly with Bonner's sentences to run concurrently, and this appeal followed.

## III. DISCUSSION

### A. The Trial Court's Disallowing Testimony Regarding Bailey's Prior Conviction and Deferred Adjudication

In part of his first issue, Bonner contends that the trial court erred by not allowing him to question Bailey about a 1997 charge for delivery of a controlled substance. Specifically, Bonner contends that Bailey was inconsistent about how he earned money. The gist of Bonner's issue is that when Bailey testified that he earned a living by running a landscaping business and a snow cone stand only, it was inconsistent with Bailey having previously judicially admitting to delivery of a controlled substance in exchange for deferred adjudication. And, according to Bonner, delivery of a controlled substance necessarily implies that Bailey earned money selling illegal drugs. Thus, Bonner contends that the trial court abused its discretion by not allowing him to introduce evidence from the 1997 case—his judicial admission—as an inconsistent statement.

As a general rule, a party may impeach a witness with evidence of a prior inconsistent statement if the party first presents the witness with the existence of the statement, the details and circumstances surrounding the statement, and an opportunity to explain or deny the statement. Tex. R. Evid. 613(a). Moreover, to be admissible as an inconsistent statement, the prior statement must actually be inconsistent with the one given at trial. *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). The trial court makes the determination whether the statements are indeed inconsistent. *See id.*; *see also United States v. Hale*, 422

8

U.S. 171, 176, 95 S. Ct. 2133, 2140 (1975) ("As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent."). We review the trial court's exclusion of testimony under an abuse of discretion standard. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App.), *cert. denied*, 534 U.S. 855 (2001). As long as the trial court's ruling is within the zone of reasonable disagreement, we will not intercede. *Id.*

Here, Bonner took Bailey on voir dire outside the jury's presence and Bailey acknowledged that he had in fact previously pleaded guilty to delivery of a controlled substance. But the trial court was not persuaded by counsel's argument that Bailey's prior judicial admission that he had delivered a controlled substance was inconsistent with his testimony at trial that he had only held the occupations of landscaper and snow-cone-stand operator. *See Lopez*, 86 S.W.3d at 230 (reasoning that trial court stands in position to determine whether a prior statement is inconsistent). Indeed, during voir dire, Bonner did not inquire of Bailey any information regarding whether he had ever made money delivering a controlled substance, whether he considered it an occupation, or the circumstances surrounding the previous charge. Furthermore, it certainly falls within the zone of reasonable disagreement whether having delivered a controlled substance is an "occupation" creating an inconsistency with Bailey's testimony that he had only ever held the two occupations he testified to. We hold that the trial court did not abuse its discretion by determining that the 1997

9

judicial admission was not inconsistent and excluding it, and we overrule this portion of Bonner's first issue. *See id.*

In part of his first issue, Bonner argues that the trial court erred by not allowing him to impeach Bailey through introduction of evidence regarding the prior delivery offense "because it showed that Bailey was given deferred adjudication and may be testifying favorable for the State because he was treated favorably at the prior setting." Citing *Maxwell v. State*, Bonner contends that an appellant "must be allowed to question a witness regarding any possible favoritism based on the granting of a deferred adjudication." 48 S.W.3d 196, 200 (Tex. Crim. App. 2001), *overruled to the extent it conflicts with Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998), *by Irby v. State*, 327 S.W.3d 138 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 904 (2011).

Impeachment based on proof of circumstances showing bias is permitted unless the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403, 613; *see also Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974) (reasoning that right to confront witnesses includes right to cross-examine witnesses concerning their possible bias, self-interest, or motives in testifying); *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). But the proponent of the impeachment evidence must establish some causal connection or logical relationship between the *pending* charges and the witness's vulnerable relationship or potential bias or prejudice for the State, or testimony at trial. *Carpenter*, 979 S.W.2d at 634.

10

There are a number of flaws in Bonner's argument. First, the court of criminal appeals has overruled *Maxwell* to the extent that it stands for the proposition that a proponent of impeachment may impeach any witness serving deferred adjudication even when there is no evidence of potential bias or prejudice for the State. *Irby*, 327 S.W.3d at 152. Second, impeachment of a witness serving deferred adjudication based on potential favoritism toward the State contemplates that the witness is currently on deferred adjudication. *See id.* at 148–51 (citing Carpenter and stating that the proponent must establish some causal connection or logical relationship between the *pending* charges). In this case, Bailey's admission regarding delivery of a controlled substance stemmed from charges in 1997, and at the time of Bonner's trial, Bailey had already served his deferred adjudication and the case had been dismissed. Finally, even under *Irby*, Bonner, as the proponent of the impeachment evidence, failed to establish any causal connection or logical relationship between the 1997 charge and Bailey's testimony at trial. *See id*. at 148 ("There must be some logical connection between that 'vulnerable relationship' and the witness's potential motive for testifying as he does."). We overrule this portion of Bonner's first issue.

In the remainder of his first issue, Bonner contends that the trial court abused its discretion by not allowing him to elicit testimony from Bailey regarding an outstanding warrant in relation to unpaid fines regarding a prior conviction for possession of marijuana. Bonner contends that the warrant is a "pending

11

criminal case" against Bailey, and that thus he automatically should have been allowed to question Bailey "regarding any benefit received by Bailey regarding that warrant in exchange for his testimony."

Bonner relies on the court of criminal appeals's decision in *Miller v. State* for the proposition that when a witness for the State has pending criminal charges or is awaiting sentencing, evidence of this fact is always admissible to show a possible motive for testifying on behalf of the State. 741 S.W.2d 382, 389 (Tex. Crim. App. 1987), *cert. denied*, 486 U.S. 1061 (1988). The policy behind the rule in *Miller* is "possible motives for fabrication due to charges pending against the State's witnesses." *Simmons v. State*, 548 S.W.2d 386, 391 (Tex. Crim. App. 1977). But Bonner's reliance on *Miller* is misplaced. Despite Bonner's characterization to the contrary, the *capias pro fine* warrant issued against Bailey that was outstanding at the time of Bonner's trial is not a "pending criminal charge." As the trial court noted, the warrant was issued in response to Bailey's alleged failure to pay a fine in relation to a prior conviction for marijuana that had already been "disposed" at the time of trial. *See* Tex. Code Crim. Proc. Ann. art. 43.015 (West 2010) (stating that a *capias pro fine* is a writ "issued by a court having jurisdiction of a case *after* judgment and sentence") (emphasis added). The trial court further informed Bonner at trial that as a past conviction for possession of marijuana, Bailey's conviction was not admissible for impeachment purposes because it was neither a felony nor a crime involving moral turpitude. *See* Tex. R. Evid. 608(b), 609(a); *see also Bell v. State*, 620

12

S.W.2d 116, 121 (Tex. Crim. App. [Panel Op.] 1980) (reasoning that misdemeanor marijuana possession does not involve moral turpitude). We conclude that the trial court did not abuse its discretion by excluding testimony regarding Bailey's outstanding warrant. We overrule the remainder of Bonner's first issue.

### B. Trial Court's Denial of Bonner's Motion for Mistrial

In his second issue, Bonner contends that the trial court abused its discretion when it denied his request for a new trial. At the punishment phase closing arguments, the prosecutor argued, "And we heard the definition of murder was met in this case. Because in a violent crime, a commission of that intent with that gun in his hand, [Robinson] was killed. So it was murder." Defense counsel objected. The trial court sustained the objection. Defense counsel then asked for an instruction to the jury to disregard the prosecutor's statement. The trial court instructed the jury to disregard the statement. Defense counsel then moved for a mistrial, which the trial court denied.

According to Bonner, the prosecutor's statement was so egregious that Bonner is entitled to a new trial on punishment. The State counters that it introduced evidence of the extraneous offense of felony murder at the punishment phase and showed beyond a reasonable doubt that Bonner committed felony murder. Thus, the State argues that the statement was not improper at all but reflective of a proven extraneous offense. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1) (West Supp. 2010). We will assume without

13

deciding that the prosecutor's argument was improper.  We conclude, however, that the trial court cured any potential error and did not otherwise abuse its discretion by denying Bonner's motion for mistrial.

Because the trial court sustained Bonner's objection and instructed the jury to disregard the argument, "[t]he only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial." *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).  We review the trial court's denial of a motion for mistrial under an abuse of discretion standard. *Russeau v. State*, 171 S.W.3d 871, 885 (Tex. Crim. App. 2005), *cert. denied*, 548 U.S. 926 (2006); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case.  *Ladd*, 3 S.W.3d at 567; *Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Crim. App. 1990), *cert. denied*, 500 U.S. 960 (1991).  A motion for mistrial will be granted only in "extreme circumstances, where the prejudice is incurable." *Hawkins*, 135 S.W.3d at 77; *see Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).  Generally, a prompt instruction to disregard an inadmissible statement will cure error.  *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000).

To evaluate whether the trial court abused its discretion by denying a mistrial for improper jury argument, the court of criminal appeals, in *Hawkins*, adopted the three factors from *Mosley v. State*, which balance:  (1) the severity of

14

the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Hawkins*, 135 S.W.3d at 77 (*citing Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

Further, we are to presume the jury will follow the court's instructions. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). In considering whether an instruction is sufficient to cure error, courts consider whether the reference was direct or implied, intentional or inadvertent, detailed or vague, and whether the topic was pursued once the instruction was given. *Kipp v. State*, 876 S.W.2d 330, 339 (Tex. Crim. App. 1994); *Waldo v. State*, 746 S.W.2d 750, 752 (Tex. Crim. App. 1988).

In this case, concerning the first *Mosley* factor, because the alleged improper argument was embedded within other remarks that invited the jury to draw a legitimate inference from evidence presented at the witness stand, the magnitude of the argument was severely diminished. We conclude that the extent of potential prejudice was not so great here as necessarily to render a firm and timely curative instruction inefficacious. To that end, and concerning the second *Mosley* factor, the trial court promptly instructed the jury to disregard the complained-of statement, and we presume that the jury followed that instruction. *See Colburn*, 966 S.W.2d at 520.

15

Furthermore, after the trial court instructed the jury to disregard the statement, the State did not refer to it again, did not attempt to highlight it, and did not make any use of it at all. Additionally, in the trial court's charge to the jury on punishment, the jury was instructed that "You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case." We presume the jury followed this instruction as well. *See generally Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (*citing Colburn*, 966 S.W.2d at 520). Nothing in the record suggests the jury disregarded either of the trial court's instructions.

Lastly, under *Mosley*, because this argument occurred at punishment, we analyze the third factor with regard to the certainty of the punishment assessed. *See Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007) (analyzing *Mosley* factors at punishment phase). The evidence against Bonner in this case is substantial both regarding the instant offense and Bonner's previous criminal history. Multiple eyewitnesses testified to Bonner's involvement in the home invasion. One witness identified Bonner as the assailant who put a gun to a three-year-old's head, threatening to blow the cereal out of the child's mouth. Hennessy, the officer at the hospital where Bonner managed to drop off his fatally-wounded accomplice, testified that Bonner fled after being patted down at the hospital. Investigators also matched a bullet found near Bonner's vehicle at the hospital to Bailey's gun. In addition, they tied his deceased accomplice, whom Bonner did drop off at the hospital, to the home invasion.

16

The State introduced evidence of Bonner's multiple prior convictions for delivery of a controlled substance, assault with bodily injury to a family member, fleeing a police officer, evading arrest, and failure to identify himself as a fugitive. Moreover, the jury assessed punishment at thirty-three years' confinement on a first degree felony, which carried with it a potential maximum of life in prison. *See* Tex. Penal Code Ann. §§ 12.32(a) (stating that the punishment range for first-degree felonies is "for life or for any term of not more than 99 years or less than 5 years"), 29.03(b) (providing that, upon conviction for the offense of aggravated robbery, a defendant is subject to the punishment range corresponding to first-degree felonies) (West 2011).

In our view, due to the strength of the State's punishment case, it is likely that the same punishment would have been assessed regardless of the prosecutor's alleged improper comment during closing argument of the punishment phase. Thus, we overrule Bonner's third issue.

## C.    Effective Assistance of Counsel

In his third issue, Bonner contends that he received ineffective assistance of counsel at trial. Specifically, Bonner contends that his counsel failed to adequately prepare for trial by failing to "investigat[e] and locat[e]" witnesses on his behalf.

To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable

17

probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63.

A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting

18

*Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

This case demonstrates the "inadequacies inherent in evaluating ineffective assistance claims on direct appeal." *Patterson v. State*, 46 S.W.3d 294, 306 (Tex. App.—Fort Worth 2001, no pet.). Bonner did not file a motion for new trial to afford the trial court a chance to hold a hearing and inquire into the reasons for trial counsel's alleged acts or omissions, or the extent to which counsel investigated Bonner's case, or the efforts he engaged in to locate witnesses to testify on Bonner's behalf. Given the record before us, there is nothing to rebut the presumption of reasonably effective assistance of counsel, and we will not speculate to the contrary. *See Jackson v. State*, 877 S.W.2d

19

768, 771 (Tex. Crim. App. 1994). Because Bonner has failed to meet the first prong of *Strickland*, we overrule his third issue.

## IV. CONCLUSION

Having overruled all three of Bonner's issues, we affirm the trial court's judgments.

BILL MEIER
JUSTICE

PANEL:  GARDNER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 25, 2011