

IN THE
TENTH COURT OF APPEALS

No. 10-15-00154-CR

VINCENT EARL ROBINSON,

Appellant

 v.

THE STATE OF TEXAS,

Appellee

From the 66th District Court
Hill County, Texas
Trial Court No. 37,731

MEMORANDUM  OPINION

A jury found Appellant Vincent Earl Robinson guilty of burglary of a habitation with intent to commit a felony and assessed his punishment, enhanced by prior felony convictions, at eighty years' imprisonment.  This appeal ensued.

Fernando Julian testified that, at about 12:30 a.m. on February 20, 2013, he was awakened when Candy Marentes knocked on the door of his home and then knocked on his window.  Julian knew Marentes and asked her what she wanted.  Marentes replied

that she needed to borrow his phone so that she could call her sister. Julian opened the door and gave Marentes his cell phone. Marentes asked Julian to turn on the light so that she could see the numbers on the phone. Marentes then went into the house and sat on the edge of Julian's bed while he sat on the couch in the room.

Julian testified that he then heard the door, looked up, and saw a black man standing there. Julian stated that the man was taller than he, had a bigger forehead, and had "shiny" teeth. The man began to struggle with him, ripping his clothes and taking him "out of the door" by force. Julian yelled to his roommate for help, but his roommate did not come out of his room. When the man lost his balance in the doorway, Julian went back into his room. He saw Marentes with his wallet in her hand. Julian tried to get his wallet from her, but he was hit in the head and "lost [his] strength." The man and Marentes then left his house running.

Julian stated that his roommate came out of his room at that point. Julian told him to call the police. Later that same day, Julian went to the police station where he was shown a photo lineup. Julian identified Robinson as the man who had assaulted him but wrote that he was forty percent not sure of the identification. When asked what that meant, Julian replied that it meant that he was sixty percent sure that Robinson was the person that hurt him. The following exchange then took place during Robinson's counsel's cross-examination of Julian:

> Q.     Okay.  And also, on the form that you signed here, you
> checked that you were unable to positively identify any of the persons in

the lineup; is that correct?

A.     That is correct.

Q.     Okay.  So you weren't positive that any of those individuals whose picture you saw was the assailant on the night that you were assaulted back on February the 19th?

A.     By the pictures, no, but I was 60 percent sure.

Q.     Okay.  But not positively able to identify the individual; is that correct?

A.     Having the person in front of me, I can identify him.

Q.     Okay.

Marentes testified that, on February 19, 2013, she and Robinson "had been getting high" on crack cocaine when Robinson said that he wanted to "hit a lick," a "street term" meaning to steal money.  Robinson "wanted to say he was an officer with a fake badge, and he was doing a prostitution sting or something like that and have them face down to take money."  Robinson and Marentes first went to Marentes's friend Raphael's house.  Marentes knocked on the door, but no one answered, so they went in search of a different target.  During that time, Robinson picked up a beer bottle and tore off the label.

Marentes testified that Robinson told her to knock on Julian's door.  Marentes knew Julian because he was a prostitution client of hers.  Marentes knocked on Julian's window while Robinson waited on the side of the house with the bottle in his hand.  Julian asked who it was, and Marentes responded that it was she.  Julian asked if she was okay and what she needed.  She told him that she needed to "make some money" but

that she also needed to use his phone. Julian asked her if she was okay, and she replied, "No." Julian opened the front door, and Marentes went into his bedroom. She asked Julian if she could use his phone to call a friend. Robinson then came through the door and hit Julian so hard that he fell to the floor. Robinson was tugging at Julian's shorts and hitting him. Robinson then got Julian's wallet and ran outside.

Marentes testified that she fell while fleeing and that Robinson left her there. She went to her aunt's house on the corner and knocked on the door. Her aunt opened the door, and Marentes told her to call the police. Marentes initially told the police that Julian had assaulted her. She told the police that she had hit Julian in the head to get away. Marentes stated, "I kept telling them the same story. There is no black man." Later that day, however, Marentes told the police "the truth" about what happened that night. At the time of trial, Marentes had "already been prosecuted and served [her] time for the burglary of a habitation in regards to … Julian."

Marentes testified that Robinson had visited her while she was in the county jail. James Daniel Orr, a licensed jailer for the Hill County Sheriff's Department Correctional Division, testified that when a person arrives to visit a jail inmate, he must present a valid ID. The ID is logged into the system showing that he was there and indicating whom he was there to visit. A printed log for a visitation on February 24, 2013, from Robinson for Marentes was admitted into evidence. Orr stated that visitors communicate with jail inmates through a telephone and that the conversations are recorded. A CD containing

the recordings for Marentes was admitted into evidence. On the recording, Robinson told Marentes not to "admit" that he was there during the incident at Julian's house. Robinson also told Marentes that if she did not tell "them" that he was there, "they" would have to "drop the case."

In addition to the above evidence, the following extraneous-offense evidence was also presented. The trial court gave the jury limiting instructions to consider the extraneous-offense evidence only for identity purposes. Marentes testified that, in early February 2013, she and Robinson had committed a similar offense. Robinson wanted her to go to Juan Escamilla's house because Robinson knew that she knew Escamilla and because Robinson thought that Escamilla had money. She and Robinson drove to Escamilla's house in her Jeep. When they arrived, Escamilla was in his truck. She parked her Jeep, got out, approached the passenger side of Escamilla's truck, and started talking to him. Robinson then walked up to the driver side of Escamilla's truck. Robinson began struggling with Escamilla and "slapped him real hard." Robinson got Escamilla's wallet. Robinson then told her to "go," and she and Robinson drove away in her Jeep.

Escamilla testified that, on February 3, 2013, he had taken his wife to work at 5:30 a.m., bought a coffee, and then gone back home. Escamilla parked in his driveway and was drinking coffee in his truck when Marentes opened his passenger-side door. He knew Marentes because he had worked with her husband. A "black man" whom Escamilla did not know then opened his driver-side door and began hitting him. The

man hit Escamilla until he got Escamilla's wallet. The man and Marentes then left in a brown Jeep Cherokee. Escamilla reported the robbery to the police but told them that he did not want to press charges.

Hillsboro Police Department Detective Israel Abrego testified that although Escamilla did not want to press charges, Abrego wanted to talk to the suspects. The following day, the police pulled over Marentes driving a brown Jeep Cherokee like the one described as being used in the offense. Robinson was in the passenger seat. No further action was taken in the case, however, because Escamilla did not want to press charges.

In his sole issue, Robinson contends that the trial court erred in admitting the extraneous-offense evidence. We assume without deciding that the trial court abused its discretion in admitting the extraneous-offense evidence. We therefore proceed to a harm analysis.

The violation of an evidentiary rule that results in the erroneous admission of evidence constitutes non-constitutional error. *See Martin v. State*, 176 S.W.3d 887, 897 (Tex. App.—Fort Worth 2005, no pet.). Under Rule of Appellate Procedure 44.2(b), an appellate court must disregard non-constitutional error unless the error affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b). A substantial right is affected when the evidence, viewed in light of the record as a whole, had a substantial and injurious influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.

App. 1997).

> [N]on-constitutional error must be disregarded unless it affects the defendant's substantial rights. This court "will not overturn a criminal conviction for non-constitutional error if the appellate court, *after examining the record as a whole*, has fair assurance that the error did not influence the jury, or influenced the jury only slightly." In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict. A conviction must be reversed for non-constitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." "[I]n cases of grave doubt as to harmlessness the petitioner must win."

*Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011) (footnoted citations omitted).

The trial court here repeatedly gave the jury limiting instructions to consider the extraneous-offense evidence only for identity purposes. And it is generally presumed that the jury follows the trial court's instructions in the manner presented. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). The extraneous-offense evidence, however, had little probative value in establishing that it was Robinson who committed the charged offense. Instead, Julian's and Marentes's identifications along with Robinson's own incriminating statements overwhelmingly established that Robinson committed the charged offense. *See Motilla v. State*, 78 S.W.3d 352, 360 (Tex. Crim. App. 2002) ("Though not dispositive, the evidence of the defendant's guilt is a relevant factor in conducting a harm analysis under Rule 44.2(b).").

After examining the record as a whole, we conclude that any error in admitting

the extraneous-offense evidence did not affect Robinson's substantial rights. *See* TEX. R. APP. P. 44.2(b). We overrule Robinson's sole issue and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed December 14, 2016
Do not publish
[CRPM]

